# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

SHAUN MOORE,

        Defendant-Appellee.

UNPUBLISHED
February 15, 2018

No. 335619
Wayne Circuit Court
LC No. 16-006139-01-FC

Before: TALBOT, C.J., and METER and TUKEL, JJ.

PER CURIAM.

The prosecution appeals as of right the circuit court's order granting defendant's motion to quash his bindover for trial on the charge of felony murder, MCL 750.316(1)(b). We reverse and remand for reinstatement of the charge.

The felony-murder charge against defendant arose after his child died in January 2016, more than 12 years after she was taken to the hospital in September 2003, when she was only six months old, having suffered serious brain injuries after being in defendant's sole care and custody overnight. As a result of the serious injuries she sustained as an infant, the child never resumed a normal life, requiring 24-hour care for more than 12 years until her death in 2016. Defendant was charged and convicted of first-degree child abuse in 2003 stemming from the incident, for which he was sentenced to a term of imprisonment. After the child, then 12 years old, died in 2016, the prosecution charged defendant with felony murder, with the underlying predicate felony being first-degree child abuse, MCL 750.136b(2).

Following the preliminary examination, the district court bound defendant over for trial on the felony-murder charge, finding that he intentionally inflicted the injuries on the child in 2003 and that the child ultimately succumbed to those injuries when she died in 2016. The circuit court, upon defendant's motion, quashed the bindover, concluding that the evidence was not sufficient to establish probable cause that the child's death was a murder.

## I. FACTUAL BACKGROUND

During the afternoon or evening of September 25, 2003, defendant picked up the child and her twin, who were six months old, from their mother's home and took them to his apartment overnight to babysit while the mother went job hunting the next day. This was the first and only time that defendant had the child in his care by himself, but the mother felt

-1-

comfortable allowing him to watch the child because she had observed his past interactions with the child, which she agreed had been "good." By all accounts, the child was normal and without injury when defendant picked her up from the mother's home.

The next afternoon or evening, the child was taken to the hospital unconscious, having sustained serious brain injuries, including subdural hemorrhaging (bleeding between the skull and the covering of the brain), subarachnoid hemorrhaging (bleeding over the surface of the brain), contusions (bruising from bleeding within the brain tissue itself), and retinal hemorrhaging (bleeding in the eyes). Blood of differing ages was present on the child's brain and in her eyes. As a result of her injuries, the child required 24-hour care for the remainder of her life.

Defendant told the mother that that he was giving the child a bath and he tripped over a cord and dropped her on the floor. The next day, after speaking with doctors, the mother asked defendant about the incident again, and defendant again told her that he gave the child a bath, tripped over a cord, and accidently dropped her, but added that he "shook her . . . to revive her" because she went "limp." Defendant also gave a police statement in 2003, and it was read at the preliminary examination. In the statement, he admitted that he repeatedly shook and "wiggled" the child in an attempt to revive her after she fell when he tripped over a cord and she appeared "dazed[.]" He stated that he shook the child for approximately 15 seconds before he called 911, for approximately 10 seconds after, and about two or three times before the ambulance arrived. He stated that the child went "limp" after he shook her and admitted that his shake was "more than a playful shake" and that he may have caused the child's injuries by shaking her "too hard or too long."

On January 10, 2016, over 12 years after the child sustained her brain injuries in 2003, the mother, who provided 24-hour care for the child, noticed that the child had a fever. The child's fever broke and the mother remained with the child, checking on her throughout the evening. The next morning, the child made a breathing sound and the mother noticed that her "eyes had popped open and they were looking gloomy." The mother felt the child and observed that she did not have a fever, but it looked like she was not breathing. The mother could not hear a heartbeat with a stethoscope and began administering CPR and called 911. The child could not be revived at the hospital and was declared dead.

As indicated by the autopsy report, which was admitted into evidence at the preliminary examination over defendant's objection, the medical examiner, who did not testify at the examination, concluded that the child's final diagnosis and cause of death was "[r]emote cerebral trauma" and the manner of death was "homicide." The examiner further noted in his report that there were "multiple cerebral peritoneal drains present," her abdomen contained a feeding tube, there was an endotracheal tube in place, and there was an intravenous line present. Further, her brain displayed "cystic loss of the left frontoparietal portion of the brain" and there was "a similar area covering the area aspect of both frontal poles and a similar aspect is identified on the right temporal pole." Additionally, the report noted that the child's lungs were "somewhat collapsed and [felt] consolidated in their interior lobes," and microscopic examination indicated "lung-pneumonia."

Dr. Holly Gilmer, the pediatric neurosurgeon who treated the child in the hospital in 2003, testified at the preliminary examination regarding the extent and nature of the injuries the child sustained.[1]  She opined that the child's injuries were "definitely inflicted injuries" caused by trauma, meaning that someone injured the child, and that the injuries were not accidental and probably involved "a mechanism of shaking and impact."  Specifically, Dr. Gilmer opined:

> The pattern of injuries was complete with shaken impact syndrome or nonaccidental injury.  Usually there's a mechanism of shaking of the baby.  Usually there's an impact, too, in which the baby is slammed against a surface or thrown.  The surface does not have to be hard for the baby to have significant injury to the brain.

Dr. Gilmer further testified that a six-month-old baby could not have accidentally inflicted these types of injuries on both sides of the brain and in the eyes.  According to Dr. Gilmer, there was no possibility that an accident could have caused the injuries because an accidental fall of a baby would result in a local injury or "more focal injury," i.e., an injury in one spot, at the point where the baby hits his or her head, and is not generally associated with the retinal hemorrhaging on both sides and the "diffused injuries with bleeding on both sides of her brain" present in this case.  Additionally, Dr. Gilmer explained that an accidental fall would result in a "one-time injury" and blood of differing ages would not be present, yet blood of different ages was present in the child's eyes and her brain, indicating that she sustained multiple injuries that did not all occur at the same time.

Dr. Gilmer could not specifically recall "which blood was which age" in regards to the child's injuries, but testified that the injuries occurred "[g]enerally days" apart, as opposed to seconds, minutes, or hours apart.[2]  Regarding the subdural hemorrhaging, Dr. Gilmer recalled that "some of the blood was fresh within a few hours; some of it was within 24 hours; and then some of it might have been as old as 72 hours" from the time of the child's examination.  Dr. Gilmer's inability during her testimony to recall the timing of the subarachnoid bleeding or the contusions[3] or to recall "which blood was which age" did not affect her opinion that the child was intentionally injured, as opposed to accidentally injured, because the differing ages of blood present in her eyes and brain indicated multiple injuries that did not occur at one time.  Additionally, according to Dr. Gilmer, a child who sustained these types of injuries would show symptoms "[r]ight away."  Dr. Gilmer could not recall if the child presented with any external injuries, but testified that a lack of external injury is not uncommon if the "whole mechanism" is violent shaking or involves impact against a soft surface.

---

[1] The court qualified Dr. Gilmer as an expert in pediatric neurosurgery.

[2] Dr. Gilmer testified that she could not say 13 years later "which blood was which age" but stated that there is "documentation that the blood was of different signal intensity from the imaging studies that goes along with different ages."

[3] Dr. Gilmer testified that she would need to refer to the radiology reports to ascertain the timing of those injuries.

Dr. Gilmer further opined that, if someone was attempting to revive a child by shaking and wiggling the child back and forth, such acts could not have caused injuries of the nature that the child sustained because her injuries were of differing ages that did not all occur at the same time. Moreover, although it was possible that the presence of blood of different ages could result if there was more than one attempt to revive a child with violent shaking, such attempts would have had to occur on different days, as opposed to seconds, minutes, or hours apart. Dr. Gilmer also testified that the injury that caused a subdural hemorrhage could have "possibly" occurred as far as 72 hours before the time of the examination given the age of the blood, but she did not know if her memory was "that good." According to Dr. Gilmer, a subdural hemorrhage, by itself, could be caused by an accident, such as a child falling off of a surface located two or three feet above the floor and hitting her head, and the bleeding over the surface of the brain, which was different from a subdural hemorrhage, could also result from an accident, but it would be a "very high velocity accident[.]" She stated that it takes "a very great [im]pact to disrupt the blood vessels in the subarachnoid."

## II. STANDARD OF REVIEW

"A district court's decision to bind a defendant over for trial will not be disturbed absent an abuse of discretion." *People v Green*, 260 Mich App 710, 713; 680 NW2d 477 (2004). "On review, the circuit court is limited to the entire record of the preliminary examination and may not substitute its judgment for that of the district court." *Id*. at 713-714. "The circuit court may reverse the district court decision only if there appears to be an abuse of discretion." *Id*. at 714. "This Court, in turn, reviews the circuit court's decision de novo to determine if the district court abused its discretion." *Id*. "Because the legal issue presented is whether the magistrate abused his or her discretion, this Court gives no deference to the circuit court's decision regarding a motion to quash a bindover order." *People v Harlan*, 258 Mich App 137, 145; 669 NW2d 872 (2003). Accordingly, "[t]his Court reviews for an abuse of discretion the district court's decision whether to bind a defendant over for trial." *Id*.; see also *People v Feeley*, 499 Mich 429, 434; 885 NW2d 223 (2016). "An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes." *People v Seewald*, 499 Mich 111, 116; 879 NW2d 237 (2016) (quotation marks and citation omitted).

## III. ANALYSIS

The prosecution argues that the evidence presented at the preliminary examination was sufficient to establish probable cause that defendant committed felony murder and that a bindover was warranted.

"[T]he preliminary examination has a dual function, i.e., to determine whether a felony was committed and whether there is probable cause to believe the defendant committed it." *People v Yost*, 468 Mich 122, 125-126; 659 NW2d 604 (2003). "The district court must bind the defendant over for trial if, at the conclusion of the preliminary examination, the district court finds 'probable cause' to believe that the defendant committed the crime." *People v Orzame*, 224 Mich App 551, 558; 570 NW2d 118 (1997); see also MCL 766.13 and MCR 6.110(E). "Probable cause requires a quantum of evidence 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief' of the accused's guilt." *Yost*, 468 Mich at 126, quoting *People v Justice (After Remand)*, 454 Mich 334, 344; 562 NW2d

652 (1997). "This probable cause standard is not a very demanding threshold," *Harlan*, 258 Mich App at 145, and the quantum of evidence required to bind a defendant over for trial is "much lower" than that necessary to establish that a defendant committed the crime beyond a reasonable doubt, *People v Greene*, 255 Mich App 426, 443-444; 661 NW2d 616 (2003).

Despite the "rather low level of proof" required to establish probable cause, the prosecution must present "some evidence with respect to each element of the offense charged, or evidence from which the elements may be inferred." *Harlan*, 258 Mich App at 145 (quotation marks and citation omitted). Circumstantial evidence and the reasonable inferences drawn from the evidence can be sufficient to establish probable cause to believe a crime was committed and that the defendant committed it. *Id*. at 147; *Greene*, 255 Mich App at 444. Further, "[i]f the evidence introduced at the preliminary examination conflicts or raises a reasonable doubt about the defendant's guilt, the magistrate must let the factfinder at trial resolve those questions of fact. This requires binding the defendant over for trial." *Id*. (quotation marks and citation omitted). "In other words, the magistrate may not weigh the evidence to determine the likelihood of conviction, but must restrict his or her attention to whether there is evidence regarding each of the elements of the offenses, after examining the whole matter." *Id*. (quotation marks and citations omitted). "Resolution of this issue essentially involves the determination whether the evidence presented to the district court was sufficient to establish, as a matter of law, that the offense charged probably had been committed by the defendant." *People v Flowers*, 191 Mich App 169, 174; 477 NW2d 473 (1991).

"The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). The charge of felony murder against defendant was based on the underlying predicate felony of first-degree child abuse, which is specifically enumerated under MCL 750.316(1)(b). Thus, in order to have defendant bound over for trial on the charge of felony murder in the present case, the prosecution must have presented some evidence that defendant committed second-degree murder and did so during the commission of first-degree child abuse. *People v Aaron*, 409 Mich 672, 728; 299 NW2d 304 (1980); *Flowers*, 191 Mich App at 174-177.

## A. THE KILLING OF THE CHILD

First, we find that the evidence was sufficient to create the reasonable inference that a killing occurred in this case. *Gayheart*, 285 Mich App at 210. Dr. Gilmer's testimony indicated that the child's serious brain injuries she sustained as an infant were nonaccidental and intentionally inflicted. The mother's testimony that the child required 24-hour care afterward, until her death, indicates that the child never fully recovered from her injuries so she could resume a normal life, but continued to languish from the injuries at the time of her death. The medical examiner's conclusions in the autopsy report that the child's final diagnosis and cause of death was "remote cerebral trauma" and her manner of death was "homicide" create the reasonable inference that the child's serious brain injuries she sustained as an infant ultimately caused her death over 12 years later. We agree with the district court that the evidence sufficiently supported the inference that the child finally succumbed to the serious brain injuries

-5-

inflicted upon her in 2003 and that the manner of her death was homicide. A person of ordinary prudence and caution could entertain a reasonable belief from the evidence and the reasonable inferences from it that the intentional acts inflicted on the child when she was an infant ultimately caused her death, and thus, that a killing occurred in this case. *Yost*, 468 Mich at 126; *Gayheart*, 285 Mich App at 210.

We recognize, as defendant asserts, that there was clearly a lengthy period between the child's injuries and her death, that the child had a fever during the evening before she stopped breathing, and that the autopsy report indicated that her lungs were "somewhat collapsed" and she had pneumonia in her lungs at the time of her death. However, the medical examiner's conclusion that the child's final diagnosis and cause of death was "remote brain trauma" supports the reasonable inference from the evidence that her death was the "natural and probable consequence," i.e., a foreseeable result, of the serious brain injuries intentionally inflicted upon her in 2003, especially in light of the fact that she never resumed a normal life following her injuries and required 24-hour care until her death. *People v Bowles*, 234 Mich App 345, 349-350; 594 NW2d 100 (1999), aff'd 461 Mich 555 (2000). While a murder conviction cannot rest on uncertain medical speculation concerning the cause of death, *People v Stevenson*, 416 Mich 383, 392-393; 331 NW2d 143 (1982), the child's cause of death in the instant case was based on the medical examiner's determination and not speculation. Further, although the evidence may conflict regarding the child's final condition, "[i]f the evidence introduced at the preliminary examination conflicts or raises a reasonable doubt about the defendant's guilt, the magistrate must let the factfinder at trial resolve those questions of fact." *Greene*, 255 Mich App at 444 (quotation marks and citations omitted). Additionally, the Michigan Supreme Court has recognized that, if proximate causation can be established beyond a reasonable doubt, a murder conviction is warranted whether the charges are brought 5, 10, or even 20 years after the injury. *Stevenson*, 416 Mich at 392-394 (abrogating the "year and a day" rule, which required that the victim must have died within a year and a day of an assault to bring murder charges and recognizing that there is no statute of limitations for murder).

Next, we find that, contrary to defendant's argument, the evidence was sufficient to support the reasonable inference that defendant committed the intentional acts that caused the child's serious injuries that ultimately killed her. The evidence indicates that defendant picked the six-month-old child up from the mother's home during the afternoon or early evening of September 25, 2003, to care for her overnight while the mother went job hunting the next day. By all accounts, when defendant picked up the child, the child was normal and without injury. By the following afternoon, September 26, 2003, within 24 hours, the child was hospitalized and in a coma, having suffered the serious brain injuries. As noted, Dr. Gilmer, the pediatric neurosurgeon who treated the child, opined that the injuries were not accidental, as defendant claimed. Significant to Dr. Gilmer's conclusion that the child's injuries were intentionally inflicted, and not consistent with defendant's explanation that the injuries resulted from a one-time accidental injury, was the presence of injuries in both sides of the brain and retinal hemorrhaging in both eyes, and the findings that blood of differing ages was present in both her brain and retinal cavities. Although Dr. Gilmer could not testify definitively at the preliminary examination regarding the timing of the child's brain injuries, she stated that she thought that some of the blood from the subdural hemorrhaging was "fresh within a few hours; some of it was within 24 hours; and then some of it might have been as old as 72 hours" from the time of the child's examination. Despite the absence of evidence indicating which specific brain injury

-6-

caused the child's death, our review of the testimony indicates that the timing of her injuries was generally consistent with the period that the child was in defendant's sole care and custody and was " 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief'" that defendant committed the acts against the child that caused her serious injuries that ultimately led to her death. *Yost*, 468 Mich at 126, quoting *Justice*, 454 Mich at 344.

Testimony indicates that the child was in defendant's sole care and custody overnight for at least 18 hours before her hospitalization with serious brain injuries. By defendant's account, he picked up the child from the mother's home around 6:00 p.m. and the child fell around noon the following day, after which defendant called 911 and she was hospitalized. By the mother's account, the child was in defendant's care even longer because she testified at one point that he picked up the child from her home in the "afternoon" and she was notified that the child was hurt and in the hospital in the evening. This timing supports the reasonable inference that the child's injuries, as indicated by the differing ages of the blood (some occurring within a couple of hours and some occurring within 24 hours or "days apart"), could have been intentionally inflicted on more than one occasion, during the time that the child was in defendant's *sole* care and custody. Although Dr. Gilmer also testified that some of the blood "might have been as old as 72 hours," making it "possible" that a subdural hemorrhage could have occurred at that time, and there was no testimony specifically indicating that the child was in defendant's care or custody 72 hours before her hospitalization, Dr. Gilmer also testified that the type of injuries the child suffered would manifest "right away" and, by all accounts, the child was acting normal and was without injury when defendant picked her up from the mother's home the prior day.

Despite the lack of evidence specifically identifying which brain injuries caused the child's death and the lack of definitive timing regarding the injuries, we find that the evidence presented was sufficient to create a reasonable inference that the child sustained her serious brain injuries, resulting in her need for 24-hour care and ultimately causing her death due to "remote brain trauma," while she was in defendant's sole care and custody. Thus, there was probable cause that defendant's actions were a "contributory cause that was a substantial factor" in or affirmatively contributed to the child's death. *People v Bailey*, 451 Mich 657, 676; 549 NW2d 325, amended 453 Mich 1204 (1996); *People v Zak*, 184 Mich App 1, 11; 457 NW2d 59 (1990). We disagree with defendant's argument that there was no evidence from which it could be inferred that his intentional acts actually caused the injuries that led to her death.

B. MALICE

Next, we find that the prosecution presented sufficient evidence from which it could be inferred that defendant acted with the requisite malice to establish felony murder. The element of malice required for statutory felony murder is "the same as that required for second-degree murder: the intention to kill, the intention to do great bodily harm, or the wanton and willful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm." *Flowers*, 191 Mich App at 176. "The facts and circumstances of the killing may give rise to an inference of malice." *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999). "A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Id*. We note that, because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient. *People v McGhee*, 268 Mich App 600, 623; 709 NW2d 595 (2005).

The facts and circumstances gave rise to an inference of malice in this case. From Dr. Gilmer's testimony indicating that the child's serious brain injuries were not accidental, but were intentionally inflicted consistent with a pattern of shaking and with impact occurring on more than one occasion, as well as from defendant's apparent understanding from his police statement that shaking the child could cause the child serious injuries,[4] we conclude that sufficient evidence existed to create the reasonable inference that defendant "intentionally set in motion a force likely to cause death or great bodily harm." *Carines,* 460 Mich at 759.[5]

## C. DURING THE COMMISSION OF FIRST-DEGREE CHILD ABUSE

To convict defendant, the prosecution must establish that defendant committed the murder in the perpetration of first-degree child abuse. "The elements of first-degree child abuse are (1) the person, (2) knowingly or intentionally, (3) causes serious physical or mental harm to a child." *People v Gould*, 225 Mich App 79, 87; 570 NW2d 140 (1997). The evidence as discussed above sufficiently establishes these elements.

## IV. CONCLUSION

We conclude that the prosecution presented sufficient evidence at the preliminary examination to establish probable cause that defendant committed felony murder. As noted, the "probable cause standard is not a very demanding threshold." *Harlan*, 258 Mich App at 145. The "quantum of evidence" need only be " 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief' of the accused's guilt." *Yost*, 468 Mich at 126, quoting *Justice*, 454 Mich at 344. It is sufficient to establish probable cause if "the prosecutor presents some evidence with respect to each element of the offense charged, or evidence from which the elements may be inferred." *Harlan*, 258 Mich App at 145 (quotation marks and citations omitted). The prosecution presented evidence from which the elements of felony murder as well as the underlying predicate felony of first-degree child abuse could be inferred, including causation and the requisite intent. Thus, the district court did not abuse its discretion in concluding that sufficient evidence supported a bindover for trial on the charge of felony murder. *Green*, 260 Mich App at 713-714; *Harlan*, 258 Mich App at 145. Accordingly, we reverse the circuit court's order quashing the bindover.

---

[4] Defendant's statement to the police reflects, to some extent, his understanding that shaking the child could seriously injure her.

[5] Again, defendant argues that the medical testimony could not establish that he possessed the requisite intent to murder because the timing of the child's injuries indicated that the child sustained the older injuries, indicative of intentional, non-accidental injury, *before* she was in his care and custody. However, as discussed, Dr. Gilmer's testimony regarding the timing of the child's injuries, albeit not definitive, was generally consistent with the timing of the child's overnight stay, i.e., "days apart" or "within 24 hours."

Reversed and remanded for reinstatement of the felony-murder charge and for further proceedings. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Patrick M. Meter
/s/ Jonathan Tukel