PEOPLE v ZAK

PEOPLE v ANDERSON

Docket Nos. 107243, 108269. Submitted April 12, 1990, at Detroit. Decided June 4, 1990. Leave to appeal applied for.

Robert J. Zak was charged with first-degree murder and Gene H. Anderson was charged with first-degree murder and possession of a firearm during the commission of a felony in connection with the shooting death of Richard Solo. The victim had been a gun dealer and sold a gun to Zak, who in turn resold the gun to Anderson. The shooting was the result of an argument inside the victim's residence between the victim and defendants concerning Anderson's refusal to register the gun. Following a joint trial before separate juries in Detroit Recorder's Court, Vera Massey Jones, J., Zak was convicted of second-degree murder and Anderson was convicted as charged. Zak appealed as of right, Anderson appealed by leave granted, and the appeals were consolidated.

The Court of Appeals *held*:

1. The trial court did not err in refusing Zak's request for a jury instruction on involuntary manslaughter. The evidence adduced at trial would not have supported a conviction of involuntary manslaughter. Contrary to Zak's contention, the killing had not resulted from Zak's commission of a lawful act which was negligently performed, nor had Zak unintentionally caused the victim's death by the negligent omission to perform a legal duty. Zak's conduct in reselling the gun to Anderson was not grossly negligent and, even if it was, Zak's conduct did not cause the victim's death. Rather, it was Anderson's shooting of the victim which caused the victim's death. Further, because Zak had no legal duty to come to the victim's aid after the shooting, his failure to aid the victim cannot constitute involuntary manslaughter.

2. The trial court did not err in refusing Zak's requested jury

REFERENCES

Am Jur 2d, Criminal Law §§ 4, 130, 167; Homicide §§ 45, 70, 74, 75, 92; Trial §§ 876, 882; Witnesses §§ 152, 153, 161.

Lesser-related state offense instructions: modern status. 50 ALR4th 1081.

instruction that "if [the jury] should not find for any reason that [Zak] did intend to help [Anderson], then [the jury] must find [Zak] not guilty." The trial court's own instructions as to conviction as an aider and abettor adequately instructed the jury.

3. The trial court did not err in refusing to instruct the jury in Anderson's case as to manslaughter. Even if Anderson were entitled to such an instruction, the trial court's failure to instruct on manslaughter was harmless error. In Anderson's case, the jury was instructed on second- and first-degree murder. The jury's rejection of second-degree murder reflects an unwillingness to convict on manslaughter had the jury been so instructed. Thus, the trial court's failure to instruct on manslaughter was harmless error.

4. The trial court's admission of testimony by Deborah Anderson, who was defendant Anderson's fiancée at the time of the shooting and ex-wife at the time of trial, was not in violation of either the spousal privilege or the confidential communication privilege since neither privilege applied.

5. The prosecution's impeachment of a witness it offered in Anderson's case concerned a trivial matter. Thus, such impeachment, if error, was harmless.

Affirmed.

1. HOMICIDE — INVOLUNTARY MANSLAUGHTER — FIRST-DEGREE MURDER — JURY INSTRUCTIONS.

Involuntary manslaughter is a cognate lesser included offense of first-degree murder, and a jury instruction on involuntary manslaughter must be given in a trial on a charge of first-degree murder where the evidence adduced at trial would support a conviction for involuntary manslaughter.

2. HOMICIDE — INVOLUNTARY MANSLAUGHTER — GROSS NEGLIGENCE.

A conviction of involuntary manslaughter requires proof of gross negligence.

3. NEGLIGENCE — GROSS NEGLIGENCE.

A finding of gross negligence requires proof of (1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another, (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand, and (3) the omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.

4. CRIMINAL LAW — CULPABILITY — MENS REA — CAUSATION.

The assignment of criminal responsibility on a defendant requires a determination that the defendant acted with the requisite mens rea and that the conduct for which he stands accused was the proximate cause of harm to the victim.

5. CRIMINAL LAW — CULPABILITY — CAUSATION — INTERVENING PROXIMATE CAUSE.

A defendant's conduct is not the proximate cause of harm suffered by the victim if, subsequent to the defendant's wrongful conduct, an independent third party or the victim performs a free, deliberate and informed act to exploit the situation created by the defendant.

6. CRIMINAL LAW — AIDING AND ABETTING — INTENT.

A defendant is guilty as an aider and abettor if he possesses the same intent as the principal.

7. CRIMINAL LAW — JURY INSTRUCTIONS — APPEAL.

Jury instructions are reviewed in their entirety in order to determine if error requiring reversal occurred; even if instructions may be somewhat imperfect, reversal is not required if the instructions fairly presented the issues to the jury and sufficiently protected the rights of the defendant.

8. CRIMINAL LAW — JURY INSTRUCTIONS — COGNATE LESSER INCLUDED OFFENSES — HARMLESS ERROR.

Where a trial court instructs a jury on a lesser included offense which is intermediate between the greater offense and a second lesser included offense, for which instructions were requested by the defendant and refused by the trial court, and the jury convicts on the greater offense, the failure to instruct on the second lesser included offense as requested is harmless error.

9. WITNESSES — HUSBAND AND WIFE — SPOUSAL PRIVILEGE.

The spousal privilege, which bars one spouse from testifying for or against the other spouse without the other spouse's consent, applies only when the witness and his spouse are married at the time of trial (MCL 600.2162; MSA 27A.2162).

10. WITNESSES — HUSBAND AND WIFE — CONFIDENTIAL COMMUNICATION PRIVILEGE.

The confidential communication privilege, which bars one spouse from testifying as to any communications made by one spouse to the other during the marriage without the consent of the other spouse, applies whether the testimony is sought during

the marriage or afterwards, as long as the communication occurred during the marriage (MCL 600.2162; MSA 27A.2162).

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of Research, Training and Appeals, and *Joseph A. Puleo* and *Susan Randolph,* Assistant Prosecuting Attorneys, for the people.

*David F. DuMouchel* and *Cynthia J. H. Oberg,* for defendant Zak.

*George L. Corsetti,* for defendant Anderson.

Before: Sᴀᴡʏᴇʀ, P.J., and Mɪᴄʜᴀᴇʟ J. Kᴇʟʟʏ and R. B. Bᴜʀɴs,* JJ.

Sᴀᴡʏᴇʀ, P.J. In Docket No. 107243, defendant Zak was convicted of murder in the second degree. MCL 750.317; MSA 28.549. He was sentenced to serve fourteen to sixty years in prison and now appeals. In Docket No. 108269, defendant Anderson was convicted of murder in the first degree, MCL 750.316; MSA 28.548, and of possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Defendant Anderson was sentenced to mandatory life in prison without parole plus an additional two-year consecutive sentence for the felony-firearm conviction. He now appeals by leave granted. In both cases, we affirm.

Defendants' convictions arise out of the July 4, 1985, killing of Richard Solo in the City of Detroit. The victim, who was a gun dealer, had, several months before the murder, sold a gun to defendant Zak. Zak, who was also acquainted with defendant Anderson and knew that Anderson collected guns

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

as a hobby, thereafter sold the gun to Anderson at a modest profit. Shortly thereafter, the victim expressed concern to Zak that Zak had not registered the gun and, therefore, it remained in the victim's name. Solo subsequently expressed concern again, threatening to break either Zak's legs or arms if Zak did not register the gun properly. The gun, as noted above, had been sold to defendant Anderson, who refused to register it, apparently because he had installed an illegal silencer on the firearm, thus precluding registration. This dispute is apparently the reason for the slaying of Solo.

On the evening of the murder, defendants, along with Anderson's then-fiancée (and now ex-wife) Deborah Anderson and one Duane Nash, went to Solo's apartment, where they confronted him, resulting in Anderson's shooting Solo. Specifically, Nash testified that they went to the victim's apartment with a plan to kill him. According to Nash, Zak was to go up to Solo's apartment to give Solo a gun permit for the handgun and discuss the matter with Solo. Further, Zak was to leave the apartment door open, if possible, so defendant Anderson could enter and kill Solo. Zak gives a somewhat different version of events, testifying that he was unaware of Anderson's plan to kill Solo. Rather, according to Zak, he went to Solo's apartment with the gun permit in an attempt to settle the dispute. Solo let him into the apartment, leaving the door open himself. Anderson, who was supposed to wait in the lobby, came up and, unbeknownst to Zak, entered the apartment and opened fire. Deborah Anderson was not charged in the incident and Duane Nash pled guilty to a charge of second-degree murder. Both testified against defendants at trial.

Defendant Zak first argues that the trial court

erred in refusing his request to instruct the jury on the lesser offense of involuntary manslaughter. We disagree.

Involuntary manslaughter is a cognate lesser included offense of first-degree murder. *People v Heflin*, 434 Mich 482, 497; 456 NW2d 10 (1990); *People v Beach*, 429 Mich 450, 494; 418 NW2d 861 (1988). Thus, since Zak was originally charged with first-degree murder, the trial court was required to instruct on involuntary manslaughter only if the evidence adduced at trial would support a conviction on that lesser offense. *Heflin, supra* at 495, 504; *Beach, supra* at 464. We conclude that the evidence does not support such an instruction.

Zak offers two theories under which he could be guilty of involuntary manslaughter. Specifically, Zak asserts that the evidence could establish (1) that the killing resulted from the commission of some lawful act, negligently performed, or (2) that he unintentionally caused the death of the victim due to a negligent omission to perform a legal duty. See *Beach, supra* at 477. We conclude, however, that the evidence does not support either theory.

With respect to the first theory, that Zak unintentionally caused the killing of the victim by the negligent commission of a lawful act, Zak cites his sale of the weapon to defendant Anderson, which weapon was ultimately used to kill the victim, as the negligent performance of a lawful act since Zak knew Anderson was unstable and should not have had access to a weapon. Zak, however, cites no authority for the proposition that the lawful sale of a gun to a person such as defendant Anderson constitutes negligence. In looking at this issue, we conclude that Zak's theory fails because the evidence does not support a finding that his conduct was grossly negligent and, even if he was

grossly negligent, his conduct was not the cause of the death.

With respect to the first issue, as this Court explained in *People v Sealy,* 136 Mich App 168, 172-173; 356 NW2d 614 (1984), gross negligence is required to establish involuntary manslaughter:

> To convict of involuntary manslaughter, a defendant must have been grossly negligent. *Wayne County Prosecutor v Recorder's Court Judge,* 117 Mich App 442, 446; 324 NW2d 43 (1982); *People v Ogg,* 26 Mich App 372, 386; 182 NW2d 570 (1970). Gross negligence requires:
>
> "1. Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another.
>
> "2. Ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand.
>
> "3. The omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another." *People v Orr,* 243 Mich 300, 307; 220 NW2d 777 (1928); CJI 16:4:08.

Applying this to the case at bar, Zak's conduct in previously selling the gun to defendant Anderson does not constitute grossly negligent conduct. Accepting for the purpose of argument Zak's assertion that defendant Anderson was unstable and engaged in "strange" behavior, which Zak was aware of, the selling of the gun to Anderson still would not establish grossly negligent conduct so as to create criminal responsibility under a theory of involuntary manslaughter.

Specifically, as discussed in *Sealy,* it must be apparent to the ordinary mind that the omission to use care and diligence to avoid a threatened danger is likely to prove disastrous to another.

*Sealy, supra* at 173. Here, Zak has shown no evidence to suggest that defendant Anderson was likely to use the gun supplied to him to shoot someone or, for that matter, even if Anderson was likely to do so, that Zak was aware of that fact. For that matter, Zak testified that he was aware that Anderson collected guns and that he already owned a number of guns. How then can it be grossly negligent conduct to add another gun to Anderson's collection? Indeed, it is merely fortuitous that the gun used by Anderson to shoot the victim was the gun supplied by Zak.[1] In essence, Zak argues that it is grossly negligent conduct to supply another person with the means to commit an intentional crime. We cannot accept that definition of gross negligence. Taken to an extreme, defendant's theory would impose criminal responsibility on any person who sells a firearm to another when that firearm is ultimately used in a crime.[2] We decline to adopt such a rule of law.

Similarly, we do not believe that the fact that Zak assisted defendant Anderson in gaining access to the victim's apartment constitutes a grossly negligent act upon which a finding of involuntary manslaughter can rest. In essence, defendant argues that Anderson would never have been able to gain access to the apartment if Zak had not accompanied him and that Zak knew that the victim might react violently in a confrontation over the permit issue and further knew that Anderson was armed at the time. This, Zak contends, constitutes

[1] Of course, had Zak never supplied the gun to Anderson the dispute between Anderson and the victim would never have arisen and, therefore, the shooting presumably would never have taken place. However, this concerns the issue of causation which we discuss *infra*.

[2] Indeed, this theory could be applied in other scenarios and could result in such absurdities as car dealers being held guilty of involuntary manslaughter for selling automobiles to incompetent drivers.

grossly negligent conduct by Zak. We disagree. Again, Zak does not provide us with any authority for the proposition that gross negligence includes the commission of an act which is not otherwise harmful but which provides the opportunity to another to commit a criminal act. Rather, we believe the correct analysis is that either Zak knew Anderson was going to commit a murder, in which case Zak would be equally guilty of the murder as Anderson on the basis of accessorial responsibility, or he was unaware that a crime was afoot, in which case he would have no criminal culpability. In sum, we do not believe that acts which are not negligent by themselves become negligent merely because they afford another a better opportunity to commit a crime.

However, even if one can term Zak's conduct as constituting gross negligence, a theory of involuntary manslaughter being committed by Zak must nevertheless fail due to a lack of causation between the negligent acts and the homicide. For there to be criminal responsibility, the defendant's acts must have caused the harm, that is, the killing. *Sealy, supra* at 175; see also *People v Aaron,* 409 Mich 672, 708; 299 NW2d 304 (1980). The concept of causation in determining criminal responsibility is discussed in Dressler, Understanding Criminal Law, § 14.02, pp 158-159:

> Causation analysis is divisible into two parts. "Actual cause," or what is sometimes called "factual cause" or "cause-in-fact," constitutes the first part.
>
> A factor is an *actual cause* of a result if the result would not have occurred when it did in the absence of that factor. To determine whether *D's* conduct was an actual cause of ensuing harm a factfinder must ask itself and answer the following question: *"But for D's voluntary act would the*

*social harm have occurred when it did?"* If the answer is in the negative—i.e., the social harm would *not* have occurred when it did but for *D's* voluntary act—then *D* is an actual cause of the result. This is the *sine qua non* test of causal responsibility.

The *sine qua non* test serves a limited but very important purpose. It functions in a negative manner to exclude certain forces, including human ones, from responsibility for resultant harm. That is, subject to one possible and very limited exception, *D* cannot be held criminally responsible for social harm unless he is an actual cause of the harm as defined by the *sine qua non* test.

The determination that *D* was an actual cause of a result does not mean, however, that he will be held criminally responsible for the harm. Not only must *D* have acted with the requisite *mens rea,* but he must also be the *proximate* cause of the harm. [Emphasis in original.]

Dressler then discusses the distinction which must be drawn between what will be viewed as a "cause" and that which is merely a "condition" for the harm to occur:

*D* pulls the trigger of a gun and a bullet is propelled from the gun into *v's* chest causing his instant death. Common sense tells us that *D* was the cause of the death. But for *D's* voluntary act— pulling the trigger of the gun—the social harm— *v's* death—would not have occurred when it did.

In fact, however, the *sine qua non* test may result in the inclusion of additional "actual causes" of *v's* death. For example, *v* would not have died but for the fact that his heart muscle was too weak to withstand the intrusion of the bullet. Other causes of the death are found in certain principles of physics that explain how and why the pulling of the trigger results in a bullet moving at a fast rate of speed. Indeed, if *v's* mother had not given birth to *v*, he could not have been killed by *D*.

Usually a court will either ignore these latter "causes" or identify them more realistically as necessary "conditions" for the harm to occur. Although "conditions" may technically meet the *sine qua non* test of causation, their exclusion from the latter category is consistent with a common sense view of the issue.

In determining causation people focus on what is interesting in an event. They focus on the abnormal, the matters that seem out of the ordinary. *Conditions* are normal events or circumstances that, although necessary for the result to occur, do not positively contribute to it. The firing of the gun at $v$ is the act that seems most interesting and out of the ordinary. It is $D$'s conduct, not the laws of physics or the structure of $v$'s heart, that affirmatively contributed to the social harm. [*Id.* at 159; emphasis in original.]

Turning to the case at bar, we conclude that Zak's conduct is, at most, a condition necessary for the killing to have occurred, rather than the causation of the victim's death. As noted above, it was factually necessary for Zak to have sold the gun to Anderson since, if the sale had not occurred, the dispute between the victim and Anderson would never have arisen and, therefore, Anderson presumably would never have had a reason to kill the victim.

In terms of causation, however, such a fact is on a par with reasoning that the victim could not have been killed if the victim had never been born. While true, it does not establish causation for the killing. Accordingly, while the sale of the gun may have been a necessary condition to give rise to the events which culminated in the victim's death, we do not believe it can be said that that sale constituted the cause of the victim's death. Rather, it was Anderson's shooting the victim which caused his death.

Zak's other contention, that he committed a grossly negligent act by accompanying Anderson to the victim's apartment and thus arguably allowing Anderson to have access to the apartment and the opportunity to kill the victim, is similarly without merit. Again, this is at most a condition necessary to give rise to the events involved.[3] While Zak's presence may have been a necessary condition in order for the final confrontation to have occurred, resulting in the killing, Zak's presence was not itself a cause of the homicide. His presence did not cause Anderson to pull the trigger and mortally wound the victim.

The causal link between Zak's actions and the victim's death becomes more tenuous when the issue of proximate cause is considered. Even if we accept the concept that Zak's allegedly negligent acts of supplying the gun to Anderson and accompanying Anderson to the victim's apartment are actual causes of the killing, it remains necessary that they also be the proximate, or legal, cause of the victim's death. Dressler, *supra*, § 14.03, pp 162-163. We conclude that it is Anderson's voluntary act of shooting and killing the victim which constitutes the intervening, proximate cause of the victim's death.[4] As explained by Dressler, *supra* at 166, an intervening, voluntary act becomes the proximate cause of the crime:

> A fourth principle that explains many cases is this: ordinarily, *D* is not the proximate cause of social harm suffered by *V* if, subsequent to *D*'s wrongful conduct, a human being (either *X*, an independent third party, or *V*) performs a "free, deliberate, and informed . . . [act to] exploit the

---

[3] Assuming, of course, that Zak did not do so intentionally in order to assist Anderson in the killing.

[4] Again, assuming that Zak did not intentionally assist Anderson.

situation created by [D]." [Quoting H.L.A. Hart &
T. Honore, Causation in the Law (2d ed, 1985), 32-
37.]

In the case at bar, defendant Anderson commit-
ted a free and deliberate act of shooting the vic-
tim, thus becoming the proximate cause of the
victim's death. Indeed, for that matter, neither of
Zak's acts by themselves, providing the gun to
Anderson or accompanying Anderson to the vic-
tim's apartment, could have caused the victim's
death. It is only by defendant Anderson's subse-
quent choice to shoot the victim that the victim's
death could have ensued. Accordingly, it is that
shooting by Anderson which constitutes the proxi-
mate cause of the victim's death and any liability
by Zak must be viewed in that context.

Zak would, in essence, have us conclude that one
can negligently or recklessly aid and abet a mur-
der, with such negligence establishing involuntary
manslaughter. Such a conclusion, however, would
be contrary to the rules concerning accessorial
liability. A person is guilty as an aider and abettor
if he possesses the same intent as the principal.
*People v Kelly,* 423 Mich 261, 278; 378 NW2d 365
(1985). Thus, to be guilty of first-degree murder as
an aider and abettor, the defendant must possess
the intent to kill. See *id.* Without such an intent,
there would be no criminal responsibility.

As Dressler explains, one cannot recklessly aid
and abet a crime:

> Suppose that *s* is a customer in a bank when *p*
> enters and announces that he is robbing it. *S,*
> startled, unthinkingly exclaims, "You'll never suc-
> ceed because the guard is right behind you."
> Alerted, *p* turns around and succeeds in disarming
> the guard and robbing the bank. Under these facts
> it is clear that *s* assisted *p* in the robbery because

his comments provided information that was useful (perhaps even necessary) to P.

Nonetheless, s is not an accomplice of P because he lacked both mental states required of an accomplice. First, he did not intend for his words to assist P to engage in the robbery. At most he was reckless in this regard. Second, and following almost inextricably from the first point, s did not want the bank robbed—it was not his objective to have the bank deprived permanently of its property, the specific intent required for robbery. [Dressler, *supra*, § 30.05, p 421.]

Admittedly, Zak's culpability in the case at bar is arguably greater than that of "s" in Professor Dressler's example since s was a completely innocent bystander, while Zak is not. Ultimately, however, the issue is whether Zak knowingly and willingly (and intentionally) aided Anderson in committing the murder, in which case he is guilty of the principal offense of murder, or whether Zak was unaware of Anderson's criminal intentions and, therefore, is not criminally responsible for the killing. In either event, a conviction for involuntary manslaughter could not be sustained.

Zak offers a second theory on which a conviction for involuntary manslaughter could be sustained, namely, the failure to perform a legal duty. See *Beach, supra* at 477. In support of this argument, Zak points to the fact that, after the shooting, he returned to the victim's apartment to retrieve some incriminating evidence. Zak contends that he could have summoned aid for the victim at that time, perhaps saving the victim's life. Instead, Zak left him to die. While it is true that involuntary manslaughter can be established on the basis of the failure to perform a legal duty, *id.*, the flaw in defendant's theory is that he fails to establish that he had any legal duty to come to the victim's aid.

Since Zak had no legal duty to come to the victim's aid, his failure to do so cannot constitute involuntary manslaughter. Accordingly, the evidence would not support this theory of involuntary manslaughter and, therefore, the trial court correctly declined to so instruct.

For the above reasons, we conclude that the trial court did not err in refusing to instruct the jury on involuntary manslaughter with respect to defendant Zak.

Next, Zak argues that the trial court erroneously instructed the jury, and in so doing shifted the prosecutor's burden of proof to Zak, and also omitted from the instructions the required intent for aiding and abetting. We disagree.

Specifically, Zak complains of the instruction given to the jury to the effect that they must acquit him if they find that he did not intend to lend assistance to another person (Anderson). Defendant requested at trial that the instruction be phrased in the negative. That is, to the effect that "if you should not find for any reason that the Defendant did intend to help the other person, then you must find him not guilty." Jury instructions are reviewed in their entirety in order to determine if error requiring reversal has occurred. *People v Watkins*, 178 Mich App 439, 450; 444 NW2d 201 (1989). Thus, even if instructions may be somewhat imperfect, reversal is not required if the instructions fairly present the issues to the jury and sufficiently protect the rights of the defendant. *Id.*

While Zak's requested instruction may have been more technically correct, the instructions when read as a whole adequately instructed the jury. Specifically, the jury was instructed that Zak's mere presence at the scene of the crime, with or without knowledge that the crime was

going to occur, was insufficient to convict him as an aider and abettor. Similarly, the jury was instructed that the prosecutor had to prove beyond a reasonable doubt that Zak aided and abetted defendant Anderson while possessing the appropriate mens rea. Accordingly, we conclude that the jury was adequately instructed.

Turning to the issues raised by defendant Anderson, he argues that the trial court erred in refusing to give instructions on manslaughter. However, we need not determine whether defendant Anderson was entitled to an instruction on manslaughter,[5] since we conclude that, even if such an instruction should have been given, the failure to do so constitutes harmless error. Where the trial court instructs on a lesser included offense which is intermediate between the greater offense and a second lesser included offense, for which instructions were requested by the defendant and refused by the trial court, and the jury convicts on the greater offense, the failure to instruct on that requested lesser included offense is harmless if the jury's verdict reflects an unwillingness to have convicted on the offense for which instructions were not given. *Beach, supra* at 491. Here, the jury was instructed on both first- and second-degree murder and convicted defendant Anderson of first-degree murder. We conclude that their rejection of second-degree murder reflects an unwillingness by the jury to convict on manslaughter and, therefore, the failure to so instruct constitutes harmless error.

Next, defendant Anderson argues that the trial

---

[5] Defendant Anderson argues that a manslaughter instruction was required under the "automatic instruction rule." However, as discussed above, manslaughter is a cognate lesser included offense of first-degree murder and, therefore, is not subject to the automatic instruction rule. Rather, it need only be instructed on if the evidence would support a manslaughter conviction.

court improperly admitted testimony of Deborah Anderson contrary to the spousal privilege statute. We disagree.

Defendant Anderson's argument is misplaced as the spousal privilege doctrine does not apply to the case at bar. Defendant Anderson and Deborah Anderson were not married at the time of the crime and the communications at issue, both having occurred on July 4, 1985, with the Andersons being married two weeks later. Nor were they married at the time of trial, having been divorced on January 16, 1987, with trial being held in late November and early December of 1987.

MCL 600.2162; MSA 27A.2162 contains two distinct privileges. The first privilege, the spousal privilege, bars one spouse from testifying for or against the other spouse without the other spouse's consent where the witness and the spouse are married at the time of trial. *People v Hamacher*, 432 Mich 157, 161; 438 NW2d 43 (1989). The second privilege, the confidential communication privilege, bars one spouse from testifying as to any communications made by one to the other during the marriage without the consent of the other spouse. *Id.* at 162. The communication privilege applies whether the testimony is sought during the marriage or afterwards, as long as the communication occurred during the course of the marriage. *Id.* Here, the spousal privilege does not apply because the parties were not married at the time of trial and the confidential communication privilege does not apply because the parties were not married at the time of the communications. Accordingly, the court properly allowed Deborah Anderson to testify.

Finally, defendant Anderson argues that the trial court erred in allowing the prosecutor to impeach his own witness. Specifically, during di-

rect examination, the prosecutor asked Duane Nash, the codefendant who had pled guilty before trial, whether the victim threw up his arms as he was being shot. Nash replied, "No, not that I can remember." The prosecutor again put the question, to which the witness answered with a definitive, "No." The prosecutor then began to inquire as to the witness' testimony at the preliminary examination. Defense counsel objected on the basis that the prosecutor could not impeach his own witness. See MRE 607.

On appeal, defendant asserts that the trial court erroneously permitted the prosecutor to impeach his own witness, while the prosecutor argues that the witness was not impeached, but merely had his memory refreshed. The prosecutor's contention is clearly untenable in that the witness definitively answered "No" to the question, thus the use of the preliminary examination testimony would be solely for the purpose of impeachment. That issue aside, however, we need not determine whether it was permissible or impermissible for the prosecutor to impeach the witness because the impeachment was so utterly trivial as to make no difference in the proceedings.

The importance of the answer to the question whether the victim threw up his arms as he was being shot escapes us. More to the point, defendant Anderson does not explain to us what possible harm was done him by allowing the prosecutor to impeach Nash. Since any error could have no conceivable harm to defendant, a reversal is not required even if the trial court did err.

Affirmed.

Mɪᴄʜᴀᴇʟ J. Kᴇʟʟʏ, J., concurred in the result.