*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

GRANT CHARLES BALOGH,

        Defendant-Appellee.

UNPUBLISHED
April 16, 2020

No. 343097
Wayne Circuit Court
LC No. 17-009293-01-AR

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

GABRIEL VICTOR BALOGH,

        Defendant-Appellee.

No. 343098
Wayne Circuit Court
LC No. 17-009329-01-AR

Before: TUKEL, P.J., and JANSEN and RIORDAN, JJ.

PER CURIAM.

The prosecution appeals by leave granted a circuit court order affirming the district court's dismissal of all charges against defendants. Defendants each were charged with second-degree vulnerable adult abuse, MCL 750.145n(2); felony-murder, MCL 750.316(1)(b); and involuntary manslaughter, MCL 750.321. All of the charges related to the death of their mother, Vickie

-1-

Balogh, for whom defendants were caregivers.[1] We reverse the circuit court's order, vacate the district court's order of dismissal, and remand for proceedings consistent with this opinion.

## I. UNDERLYING FACTS

Vickie was diagnosed with spinocerebellar ataxia type I ("SCA-I"), which is an inherited condition that features a dysfunction and degeneration in the cerebellum and the associated brain pathways, including the spinal cord. People with SCA-I suffer a progressive wasting of their muscles, leading to an inability to control bodily movements. In addition to a loss of muscle mass, those with SCA-I also lose weight because of an increased metabolism, in conjunction with a difficulty in chewing. The age of onset for SCA-I is generally in the mid-thirties. The average lifespan after the onset of symptoms is between 21 and 25 years, meaning a person with SCA-I will typically die in his or her mid-fifties; Vickie was 52 when she died. In addition to having had the disease herself, Vickie had a demonstrated family history of SCA-I, as a number of her relatives, including her siblings, also undisputedly had had the disease.

Gabriel and Grant are the sons of Vickie, and lived with Vickie as her caretakers. On October 23, 2016, a Sunday, Gabriel woke up and checked on Vickie at approximately 10:00 a.m. Vickie slept on a mattress on the floor of the living room, in front of the television. Gabriel carried Vickie to the bathroom, sat her on the toilet, and let her use the bathroom. After Vickie used the bathroom, Gabriel changed her adult diaper and returned her to the mattress. Grant talked to Vickie around this time before leaving for a bar and grill at approximately 1:00 p.m., to watch a Detroit Lions football game. Grant returned to the house at approximately 5:00 p.m., at which time Gabriel checked on Vickie and found that she was not breathing.

After finding that Vickie was not breathing, both defendants loaded her into the car, and Gabriel drove her to the hospital. Upon arrival, he met with Ashley Karsten, a paramedic who was conducting triage. Karsten testified that Gabriel told her that his mother was no longer breathing, but that she had been talking to him on the way to the hospital and had passed out. Karsten observed Vickie who, to Karsten, appeared obviously dead. Gabriel later admitted to police officers that he had lied to Karsten. Vickie weighed 79 pounds, but had weighed 100 pounds as recently as a year prior to her death.

At the hospital, Gabriel spoke to Detective-Sergeant Timothy Fox about their mother's wasting disease, and stated that she had not been to a doctor in over a year. Gabriel told Detective Fox that he and his brother had discussed getting further treatment for their mother, but "they hadn't gotten around to it." Detective-Sergeant Fox also spoke to Grant. When the officer said that the police were going to execute a search warrant at the house to see the conditions under which Vickie had been living, Grant stated that doing so would give the police "the wrong impression." Grant told Detective Fox that there was not going to be much food in the house since that day, Sunday, was grocery shopping day; he also stated that typically his mother would drink

---

[1] Because the decedent, Vickie Balogh was the mother of the two defendants and all three shared the same last name, we make frequent use throughout this opinion of the various individuals' first names.

Ensure for breakfast, a nutrition bar for lunch, and for dinner they would usually get carry out, but that she often would eat cookies, cake, or candy. Grant also stated, regarding his mother's state of hygiene, that Sunday was her normal bath day but that they had not been able to bathe her that day.

Upon searching, police found little food in the house. In addition, officers discovered that Vickie slept on a urine-stained mattress on the floor of the living room. When brought to the hospital, Vickie was unclean and had an unpleasant odor.

The district court conducted the preliminary examination over the course of three days and delivered its opinion on the fourth day. The preliminary examination delved deeply into expert testimony, but there was lay witness testimony as well, particularly as to statements by defendants. Dr. Lokman Sung, an Assistant Wayne County Medical Examiner, testified regarding the autopsy he performed on Vickie. Dr. Sung admitted that he did not have any special training or expertise regarding SCA-I, but he reviewed approximately five medical journals on the topic. Dr. Sung found that Vickie's cause of death was cachexia due to malnutrition because of Vickie's severe muscle and fat wasting, as well as her gaunt skin and apparent skeletal system. He also noted Vickie's weight loss from 100 pounds as recently as September 22, 2015, to 79 pounds at the time of her death.

Dr. Sung concluded that the manner of Vickie's death, as opposed to its cause, was indeterminate because he was unable to discern whether Vickie was able to swallow or absorb nutrients. Dr. Sung testified that if he had Vickie's medical records, such as a swallow study, nutritionist consultations, or occupational therapy consultations, he would have been able to make a determinate cause of death. If Vickie could swallow or absorb nutrients, the manner of death would have been homicide because that would have indicated that Vickie was not given nutrients. But if Vickie could not swallow or absorb nutrients, Vickie's death would have been a result of SCA-I.

The defense presented contradictory expert testimony. Dr. Ljubisa Dragovic, the chief resident pathologist and chief medical examiner for Oakland County, testified that wasting of muscle mass and weight loss are inevitable aspects of SCA-I. Dr. Dragovic disagreed with Dr. Sung regarding Vickie's cause of death. Unlike Dr. Sung's opinion that the cause of death was cachexia due to malnutrition, Dr. Dragovic believed that the cause of death was focal and bronchial pneumonia complicating SCA-I. Dr. Dragovic stated that the manner of death was the natural progression of SCA-I, even though defendants could have prolonged Vickie's lifespan for a short time, which also would have prolonged Vickie's pain and suffering.

Dr. Vikram Shakkottai, the director of the ataxia clinic at the University of Michigan Hospital, Department of Neurology, testified that Vickie's loss of 40 pounds over the course of one year was in line with potential weight changes due to SCA-I because weight loss associated with SCA-I is unpredictable.[2] Dr. Shakkottai stated that malabsorption issues are not caused by

---

[2] There does not seem to be any explanation about the varying testimony among the witnesses as to the exact extent of Vickie's weight loss.

SCA-I, just as SCA-I does not impact the cognitive ability of a patient. Dr. Shakkottai opined that Vickie's death was the natural result of SCA-I, and short of "a feeding tube or some other invasive measure," there was nothing anyone could have done to prolong Vickie's life.

The district court concluded that the prosecution failed to establish probable cause of intent and causation for each of the charges against defendants. Regarding intent, the district court stated that the evidence did "not show, even by probable cause, that defendants knowingly created a very high risk of death of their mother or great bodily harm knowing that death or such harm would be the result of their actions." Regarding causation, the district court concluded, based on Vickie's medical history and Dr. Sung's inability to determine "with certainty" whether Vickie could absorb nutrients that there was no evidence that defendants caused Vickie's death. The district court also appeared to reject Dr. Sung's testimony because Dr. Sung had never performed an autopsy on a person with SCA-I and did not have any special training or expertise regarding SCA-I. Accordingly, the district court dismissed all charges against defendants. The prosecution appealed to the circuit court, which concluded that the district court did not abuse its discretion and affirmed the dismissal of all charges. This appeal followed.

## II. STANDARD OF REVIEW

A district court's decision regarding whether there is sufficient evidence to bind a defendant over for trial is reviewed for an abuse of discretion. *People v Flick*, 487 Mich 1, 9; 790 NW2d 295 (2010). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Waterstone*, 296 Mich App 121, 131-132; 818 NW2d 432 (2012). "A trial court also necessarily abuses its discretion when it makes an error of law." *People v Al-Shara*, 311 Mich App 560, 566; 876 NW2d 826 (2015).

"The purpose of a preliminary examination is to determine whether probable cause exists to believe that a crime was committed and that the defendant committed it." *People v Bennett*, 290 Mich App 465, 480; 802 NW2d 627 (2010) (citation omitted).

> A preliminary examination is not a trial and the binding over of a defendant is not a conviction. If preliminary examination evidence conflicts or raises a reasonable doubt regarding a defendant's guilt, this question is properly left for judge or jury at trial, and the binding over of the defendant is still required. [*People v Moore*, 180 Mich App 301, 310; 446 NW2d 834 (1989) (citation omitted).][3]

"The preliminary examination thus serves the public policy of ceasing judicial proceedings where there is a lack of evidence." *People v Hunt*, 442 Mich 359, 362; 501 NW2d 151 (1993).

To find probable cause requires evidence of each element of the crimes charged, or evidence from which each element may be inferred, sufficient to "cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the defendant's guilt."

---

[3] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

-4-

*Shami*, 501 Mich at 251 (quotation marks and citations omitted). Establishing probable cause does not require the prosecution to prove each element of a crime beyond a reasonable doubt, however. Rather, the level of evidence sufficient to bind over a defendant is far lower than that required to convict a defendant. *People v Greene*, 255 Mich App 426, 443-444; 661 NW2d 616 (2003). "[T]o find probable cause, a magistrate need not be without doubts regarding guilt. The reason is that the gap between probable cause and guilt beyond a reasonable doubt is broad, and finding guilt beyond a reasonable doubt is the province of the jury." *Id.* at 126 (citation omitted).

"Circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to justify binding over a defendant." *People v Woods*, 200 Mich App 283, 288; 504 NW2d 24 (1993). When the prosecution has presented competent evidence sufficient to support probable cause that the felony was committed and that the defendant committed it, the district court is required to bind the defendant over to the circuit court for trial. *People v Cervi*, 270 Mich App 603, 616; 717 NW2d 356 (2006).

"In reviewing the bindover decision, a circuit court must consider the entire record of the preliminary examination and may not substitute its judgment for that of the district court." *People v Henderson*, 282 Mich App 307, 312-313; 765 NW2d 619 (2009). "Because the legal issue presented is whether the magistrate abused his or her discretion, this Court gives no deference to the circuit court's decision regarding a motion to quash a bindover order." *People v Harlan*, 258 Mich App 137, 145; 669 NW2d 872 (2003). Thus, "[W]e review de novo the circuit court's decision to grant or deny a motion to quash charges to determine if the district court abused its discretion in binding over a defendant for trial." *People v Norwood*, 303 Mich App 466, 468; 843 NW2d 775 (2013).

## III. DISCUSSION

The standard of review dictates the outcome of this case. We find that the district court abused its discretion by weighing and failing to credit some of the evidence, rather than binding the case over for a jury to make such a determination.

The district court noted Dr. Sung's testimony that he was unable to say with certainty that Vickie could absorb nutrients. The district court also noted that the prosecution relied heavily upon Dr. Sung, despite the fact that Dr. Sung had never performed an autopsy on a person with SCA-I, and that he did not have any special training or expertise regarding SCA-I.[4] By contrast, the defense experts, on this record, presented significantly more expertise regarding SCA-I. If one were to credit either of defendants' expert witnesses, Vickie died of natural causes, although the two experts differed on just what the natural cause was. We agree that if the record evidence we are reviewing had been presented to a jury, it is likely that a jury would have viewed the prosecution as having had the poorer of the argument as to cause of death. But as noted, our review of a preliminary examination involves a very different standard; at trial, a jury weighs evidence and may reject evidence out of hand; the district court, by contrast, generally may not weigh the

---

[4] Nonetheless, at the inception of Dr. Sung's testimony, the defense had stipulated to his qualifications as an expert Forensic Medical Examiner and expert Forensic Pathologist.

evidence and must credit any evidence which a jury could believe. A jury would be required to acquit a defendant if the evidence raised a reasonable doubt; the district court, if it finds evidence which merely raises a reasonable doubt, is required to bind the case over for trial. *Moore*, 180 Mich App at 310 ("If preliminary examination evidence conflicts or raises a reasonable doubt regarding a defendant's guilt, this question is properly left for judge or jury at trial, and the binding over of the defendant is still required.").[5]

Given the procedural posture of this case, the district court was required to assume that a jury could credit the prosecution's expert testimony. This is so even if it appeared to the district court that the defense presented more qualified expert testimony, or even if the defense testimony, if credited, would undermine the prosecution's testimony. Under the proper standard, a jury would be permitted to credit Dr. Sung's testimony regarding malnutrition as the cause of death, even though a jury might well reject that testimony at trial. Moreover, the district court erred by not considering defendants' statements at all, focusing only on the expert testimony, to the exclusion of the other evidence. See *Henderson*, 282 Mich App at 312-313 (courts must consider the entire record).[6] This was an error of law and thus an abuse of discretion, *Al-Shara*, 311 Mich App at 566, because in addition to the expert testimony, both defendants made statements which the jury could find were falsely exculpatory and thus are evidence of consciousness of guilt. See *People v Seals*, 285 Mich App 1, 5-6 (false statements for the purpose of misleading or warding off suspicion may be relied on by jury as evidence of consciousness of guilt).

The dissent makes two arguments why the magistrate's decision was proper. First, the dissent argues that the magistrate properly rejected Dr. Sung's testimony as lacking credibility. Second, the dissent also argues that defendants' statements were inadmissible pursuant to the corpus delicti rule. Neither argument has merit.

---

[5] The dissent states that "Defendants have had to watch their mother suffer and die from this horrible disease, and now the majority seeks to have them stand trial for her murder." The majority does no such thing. The decision to charge the defendants rested exclusively with the Wayne County Prosecutor. See MCL 49.153 ("The prosecuting attorneys shall, in their respective counties, appear for the state or county, and prosecute or defend in all the courts of the county, all prosecutions . . . ."); *People v Maulonis*, 60 Mich App 143, 149, 230 NW2d 347 (1975) ("As the chief law enforcement officer in the county, the prosecuting attorney, not the police nor the court, decides the initial charge."); see also *Bordenkircher v Hayes*, 434 US 357, 364; 98 S Ct 663; 54 L Ed 2d 604 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."). The majority here does nothing more and nothing less than adjudicate whether the prosecution has met its burden of establishing probable cause for the charge which the prosecution elected to bring. The prosecution having met its burden, the law requires a trial on the merits.

[6] The statements are detailed in Section IV of this opinion. See also note 7 of this opinion.

-6-

## A. MAGISTRATE DETERMINATION OF CREDIBILITY

The dissent argues that in a preliminary examination, "a magistrate has a 'duty to pass judgment not only on the weight and competency of the evidence, but also [on] the credibility of the witnesses.' " That is undoubtedly the case, see *People* v *Anderson*, 501 Mich 175, 187; 912 NW2d 503 (2018); *People v Paille*, 383 Mich 621, 627; 178 NW2d 465 (1970); but the rejection of Dr. Sung's testimony by the magistrate and the dissent was not and could not have been based on a finding of lack of credibility, and therefore was improper.

"Credibility," simply means that something is "capable of being believed; trustworthy." *Random House Webster's Collegiate Dictionary* (1991). Stating that a witness lacks "credibility" means that there is reason to doubt that the witness seeks to be truthful; in the specific context of a legal proceeding, an attack on a witness's credibility refers to calling into question the witness's "character for truthfulness or untruthfulness." See MRE 608. The cases cited by the dissent confirm that in the context of rejecting a witness's testimony at the preliminary examination phase, a finding that a witness lacked "credibility" can be based only on a determination that the witness sought to mislead. In *Anderson*, for example, the victim of an alleged crime testified at the preliminary examination. At the completion of the preliminary examination, the district judge stated

> There's no witness, other than this young man, who is just all over the place everywhere and although he's claimed that this gun was pulled out, I'm just going to tell you, I am having a hard time believing that his life was at stake and we have no tape of the 911 call that supports that he felt that he was in danger.
>
> We have nothing else but his testimony that is, quite frankly, that is just incredible. He is not a credible witness. *Anderson*, 501 Mich at 180-181.

In other words, the testimony was such that the judge simply could not conclude that the witness sought to tell the truth. Because the district judge concluded that the witness was intentionally not being truthful, he properly declined to consider the witness's testimony as it lacked credibility. See *id*. at 189.

*People v Paille*, 383 Mich 621, 624; 178 NW2d 465 (1970), involved witnesses who gave rehearsed testimony. The magistrate found " 'in spite of their eagerness their incredible testimony could not possibly convince a disinterested arbiter of facts of their good faith or their truthfulness. Their calculated prevarication to the point of perjury was so blatant as to defeat its object.' " *Id*. Our Supreme Court upheld the magistrate's refusal to consider such testimony. *Id*. at 624, 629.

Here, by contrast, there is no issue regarding Dr. Sung's credibility. No one believes or has asserted that Dr. Sung's testimony was intentionally false, let alone that it approached "the point of perjury," *id*.; certainly the dissent does not make such a claim. Rather, the dissent posits that Dr. Sung's expert opinion is less worthy of credit than was the testimony of the defense experts, not because anyone believes that Dr. Sung was attempting to be untruthful, but merely because the dissent deems his qualifications less impressive. Compare MRE 608 and MRE 702. The dissent states that

The record is abundantly clear that Dr. Sung lacked any familiarity with Spinocerebellar Ataxia Type 1, and concluded that Vickie's manner of death was indeterminable. However, Dr. Dragovic, who is familiar with the disease, could easily determine that Vickie died of complications relating to Spinocerebellar Ataxia Type 1, specifically bronco pneumonia.

The dissent's rejection of Dr. Sung's testimony thus is not based on a lack of credibility; rather, the dissent conducts a battle of the experts on the merits. See, e.g., *Beadle v Allis*, 165 Mich App 516, 520; 418 NW2d 906 (1987). However, our Supreme Court has held, in the specific context of a preliminary examination involving disputed expert testimony, that it is an abuse of discretion for the magistrate to credit the testimony of one qualified expert witness over that of another, because such a determination does not involve a credibility finding.

In *People v Yost*, 468 Mich 122; 659 NW2d 604 (2003), the defendant was charged with murder of her seven-year old daughter, who died of a drug overdose. The defense theory, during a seven-day preliminary examination involving lay witnesses and extensive expert testimony, was that the child had committed suicide. See *id*. at 128-129. During the preliminary examination, the prosecution called two experts witnesses, a forensic pathologist and a toxicologist, and the defense called three expert witnesses, in pharmacology, forensic pathology, and clinical psychology. *Id*. at 122-124. The district judge refused to bind defendant over for trial, based on what the judge characterized as a lack of credible evidence of a homicide. *Id*. at 124.

The expert testimony in *Yost* was closely contested. Dr. Virani, a forensic pathologist, testified that he did not find any pill residue or granular material in the decedent's stomach during the autopsy. *Id*. at 128-129. He used this fact as the basis for his opinion that Monique, the decedent, had not taken the pills intact, i.e., the pills probably had been liquified and then ingested. *Id*. Dr. Virani also opined that children at the age of seven do not commit suicide. *Id*. at 129. "Putting these propositions together, Dr. Virani concluded that a crime, homicide, had taken place." *Id.* at 129-130.

> Dr. Fleisher, a pharmacology expert, calculated that Monique had taken eighty-nine Imipramine pills and, because he was familiar with the dissolution characteristics of Imipramine, concluded there was no reason to expect to find pill residue in Monique's stomach even if she had taken the pills whole. Dr. Simson, a forensic pathologist, testified that, having considered Dr. Fleisher's dissolution testimony, he was not surprised that no pill residue was found and he could not conclude that a homicide had occurred. The magistrate in stating his ruling indicated that Dr. Virani's two major premises were rejected as "not credible." First, he disregarded Dr. Virani's opinion that there would have been pill residue in Monique's stomach if the pills had been taken intact because Dr. Virani was not qualified in pharmacology or pharmaceutics and because this conclusion was "completely refuted" by qualified defense expert testimony. Second, he disregarded Dr. Virani's conclusion that children as young as seven do not commit suicide because Dr. Virani had limited training in psychiatry or psychology and because this conclusion was refuted by Dr. Berman. The gist of this was that the magistrate thought Dr. Virani was simply not qualified as an expert in these two areas. Having rejected these two points of Dr. Virani's testimony, the magistrate concluded that

one would have to speculate to conclude that a homicide had occurred. Moreover, if a homicide did occur, there was little to link the defendant to it. Thus, the magistrate refused to bind defendant over. *Id*. at 129-130.

The Supreme Court held that in refusing to bind the defendant over for trial, the magistrate abused his discretion. *Id*. at 131. The Supreme Court noted that although a magistrate has "authority to consider the credibility of witnesses, we have also instructed examining magistrates to not refuse to bind a defendant over for trial when the evidence conflicts or raises reasonable doubt of the defendant's guilt. *With regard to expert testimony, after the expert has been properly qualified by the court, credibility determinations are generally handled in the same manner as for lay witnesses*." *Id*. at 128 (citations omitted; emphasis added). Thus, in the context of a bindover decision, properly qualified expert testimony, as here, simply is not subject to being " 'completely refuted' by qualified defense expert testimony," because the rejection of such testimony is not a credibility determination at all. *Id*. at 129. Rather, "[b]ecause the testimony of both experts was relevant to a substantial, disputed issue in this case, and because each witness's testimony was competent and credible, resolution of the conflict between them should have been left for the fact-finder at trial." *Id*. at 132 n 11.

Here, there is no question that Dr. Sung was qualified as an expert witness for purposes of the preliminary examination. See note 4 of this opinion. Therefore, *Yost* is controlling, and resolution of the disputed testimony between Dr. Sung and the defense experts must be left for the fact-finder at trial.[7]

## B. CORPUS DELICTI RULE

The dissent also asserts that the corpus-delicti rule precludes consideration of defendants' statements, because there was insufficient evidence of intent and causation. "The corpus delicti rule requires that a preponderance of direct or circumstantial evidence, independent of a defendant's inculpatory statements, establish the occurrence of a specific injury and criminal agency as the source of the injury before such statements may be admitted as evidence." *People v Burns*, 250 Mich App 436, 438 (2002). The corpus delicti rule applies to preliminary examinations as well as trials, *People v White*, 276 Mich 29, 31, 267 NW 777 (1936), but at a preliminary examination, only a preponderance of the evidence, rather than proof beyond a reasonable doubt, is necessary to satisfy the rule, *People v Modelski*, 164 Mich App 337, 341-342 (1987). "The corpus delicti of murder requires proof both of a death and of some criminal agency that caused that death," which "must consist of evidence that is independent of the accused's confessions," *People v McMahan*, 451 Mich 543, 549; 548 NW2d 199, 201 (1996), and which is

---

[7] The dissent overlooks the fact that Dr. Sung was qualified as an expert witness. See dissenting opinion at 10 n 4. Moreover, given that Dr. Sung's qualifications as an expert witness were established by stipulation, they are not subject to challenge on appeal. *Grant v AAA Michigan/Wisconsin, Inc (On Remand)*, 272 Mich App 142, 148; 724 NW2d 498 (2006) ("A party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal."), citing *People v Carter*, 462 Mich 206, 215, 612 NW2d 144 (2000).

based on sufficient "independent evidence to support a finding of death by criminal means," *id*. at 550-551.

The dissent's corpus delicti argument fails here for a number of reasons. As an initial matter, the corpus delicti issue was raised neither at the preliminary examination, on appeal to the circuit court, nor on appeal to this Court. Rather, it was the dissent which has interjected the corpus delicti argument, for the first time, in this Court on appeal. Consequently, the issue is abandoned. See *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009) (holding that an issue was abandoned because it was raised for the first and only time by the dissent). Nevertheless, to respond to the dissent, we choose to address it here.

> In order to bind a defendant over for trial, the prosecution must establish that (1) a crime has been committed and (2) that there is a probable cause to believe that defendant committed it. The first prong of this test is the requirement that the corpus delicti of the offense be established. Since [*People v. McIntyre*, 74 Mich App 661, 665, 254 N.W.2d 603 (1977) and *People v. Hill*, 86 Mich App 706, 712-713, 273 N.W.2d 532 (1978)], establish that the issue of the sufficiency of the evidence to bind over is waived by failure to raise it below, it naturally follows that the issue of the sufficiency of the proof of the corpus delicti is similarly waived, as the latter issue is merely part of the former. [*People v Peterson*, 90 Mich App 345, 347; 282 NW2d 315, 317 (1979).]

Moreover, even if the corpus delicti argument was not waived or abandoned, it nevertheless would fail under *Yost*. Dr. Sung's testimony that Vickie's death was due to malnutrition, together with the lack of food in the house and Vickie's unclean condition, constituted sufficient, independent evidence to take defendants' statements outside the scope of the corpus delicti rule.

Given that there was sufficient evidence of criminal agency, there was no impediment to the prosecution offering defendants' statements into evidence, and those statements constituted evidence of consciousness of guilt. The import of the statements is considered in Section IV of this opinion.

The dissent essentially conducts a mini-trial and dismisses the possible evidentiary value of such evidence, opining that "True, their house was dirty, there could have been more food in the house, and perhaps in a panic, they made a poor choice to transport Vickie to the emergency room following her death." Such an approach is erroneous. See *Moore*, 180 Mich App at 310 (preliminary examination evidence which raises a reasonable doubt regarding a defendant's guilt "is properly left for judge or jury at trial, and the binding over of the defendant is still required.").

## IV. THE CHARGES

Defendants were charged with second-degree vulnerable adult abuse, involuntary manslaughter, and felony-murder. We consider each of the charges in turn.

### A. SECOND-DEGREE VULNERABLE ADULT ABUSE

The elements of second-degree vulnerable adult abuse are:

(1) that the defendant [was] a caregiver or other person with authority over the vulnerable adult, (2) that the victim [was] a vulnerable adult, (3) that the defendant engaged in a reckless act or reckless failure to act, and (4) that the reckless act or reckless failure to act caused serious physical harm or serious mental harm to a vulnerable adult. [*People v DeKorte*, 233 Mich App 564, 567; 593 NW2d 203 (1999).]

"A reckless act or reckless failure to act is conduct that demonstrates a 'deliberate disregard of the likelihood that the natural tendency of the act or failure to act is to cause physical harm, serious physical harm, or serious mental harm.'" *People v Hudson*, 241 Mich App 268, 279; 615 NW2d 784 (2000), quoting MCL 750.145m(p). "Deliberate disregard" is "a conscious decision to ignore the risk of harm that would flow from acting or failing to act, i.e., the reckless conduct." *Hudson*, 241 Mich at 280. The district court correctly determined that defendants were caregivers for Vickie and that Vickie was a vulnerable adult by virtue of her SCA-I; defendants do not contest either of those elements. The key questions here are whether defendants engaged in one or more reckless acts or failures to act, and whether such reckless acts or failures to act caused serious physical harm to Vickie.

It is not clear whether Dr. Sung's testimony, standing alone, would be sufficient to establish this charge. Dr. Sung himself could not opine whether Vickie's death was the result of her disease making it impossible for her to absorb nutrients, or whether she had the ability to absorb nutrients and she simply was not provided adequate food. However, the district court erred by completely dismissing Dr. Sung's testimony because he could not state the cause of death "with certainty." Even at trial, which requires proof by the highest standard the law imposes, there is no requirement of certainty, only proof beyond a reasonable doubt. Defendants' series of statements regarding Vickie would permit (but would not require) a jury to find that defendants withheld adequate food from her. See *Seals*, 285 Mich App at 5-6 (false statements for the purpose of misleading or warding off suspicion may be relied on by a jury as evidence of consciousness of guilt). Combining those two strands of evidence, as the district court was required to through consideration of the entire record, there was sufficient evidence to bind defendants over on the charges, because there was adequate evidence to find that Vickie died from malnutrition which was caused by defendants' withholding adequate food from her.

Defendant Grant Balogh stated to Detective-Sergeant Fox that there was little food in the house, which in fact was the case. Grant further stated that officers would "get the wrong impression" if they looked inside the house. The jury could construe that statement to refer to the lack of food, and could further construe it as a false attempt to explain away the lack of food. Grant also stated that Sunday was grocery shopping day, and that they ordinarily would have bought more food that day. The jury could also view that statement, which arguably was belied by the lack of groceries, as a false attempt to conceal defendants' failure to properly provide food for their mother. The statement that Sunday was grocery shopping day also was similar to the statement that Gabriel made, regarding Vickie's unclean condition, that Sunday was normally bath day. A jury would be permitted to consider the similarity between the two statements, and to determine that the unfortunate coincidence of failing to follow the normal schedule for grocery shopping *and* bathing was due to the statements being false, and thus demonstrated not only consciousness of guilt but coordination of false statements by the defendants. That evidence is

-11-

sufficient to establish the final two elements of second-degree vulnerable adult abuse.[8] And given that both defendants were Vickie's caregivers and thus shared in the responsibility for the condition of the house, as well as Gabriel's false statement at the hospital that Vickie had been conscious and speaking in the car but then passed out, there is sufficient evidence to bind defendants over on this charge.

## B. INVOLUNTARY MANSLAUGHTER

"Involuntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *People v. Mendoza*, 468 Mich 527, 536; 664 NW2d 685 (2003). To convict of involuntary manslaughter, a defendant must have been grossly negligent. *People v Zak*, 184 Mich App 1, 7; 457 NW2d 59 (1990). Gross negligence requires

> (1) Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) Ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) The omission to use such care and diligence to avert the threatened danger when to the ordinary mind it must be

---

[8] As to all of their actions, defendants have explanations and alternate theories. In many instances this includes alternate explanations of what particular statements meant. For example, as to the statement about Vickie not having been to the doctor for about a year, defendants assert that Vickie had seen her relatives waste and die from the same disease; she knew her condition was hopeless; she did not want to go through the same ordeal; and defendants were merely participating in carrying out her wishes. The dissent adopts that explanation, and many if not all of the others made by the defense. A jury certainly could accept the explanation about Vickie's wishes, as well as other explanations regarding the evidence, and defendants are free to make such arguments at trial. However, we cannot substitute our judgment for that of a jury by simply crediting any particular statement as true, when a possible interpretation of it is that defendants withheld food or medical treatment from Vickie for improper reasons, either intentionally or negligently. Simply put, we cannot rely on such arguments to explain away possibly conflicting evidence at this stage of the proceedings.

Moreover, while evidence of possible consciousness of guilt is sufficient to bind defendants over to stand trial, defendants may challenge such evidence at trial by showing that even though they may have *felt* guilty about the care they provided or failed to provide, such care or lack of care nonetheless did not cause Vickie's death—in other words, that while defendants may have felt guilty, and may even have believed themselves guilty of a crime, that in fact they did not cause Vickie's death. Again, the resolution of all such conflicting claims is for a jury to make.

apparent that the result is likely to prove disastrous to another." [*Id.* (citations omitted; some alterations).][9]

The prosecution sought to prove the third prong of the test, alleging that defendants negligently omitted to perform a legal duty, which arose as a result of being Vickie's caregivers. Thus, as to this count, the issue is whether they negligently omitted to perform their duty as caregivers. *Id.*

As with the second-degree vulnerable adult abuse charge, defendant's statements and the non-expert testimony, together with Dr. Sung's testimony, provide sufficient evidence to bind them over for trial, for essentially the same reasons. As already noted, there was little food in the house; defendant Grant told Detective-Sergeant Fox that a search of the house would give "the wrong impression;" and defendant Grant made a statement that Sunday was grocery shopping day and normally defendants would have bought more food on that day. As already noted, the statement about Sunday being grocery shopping day (and Gabriel's statement that Sunday was bath day) were such that a jury could find that they were falsely made with the intent to deflect blame. *Seals*, 285 Mich App at 5-6. Defendants' shared responsibility for Vickie's care, together with defendant Gabriel's false statement about her speaking in the car on the way to the hospital, together with Dr. Sung's testimony, are sufficient evidence from which a jury could properly conclude that defendants rightly believed they had not provided Vickie proper nutrition and that this withholding of food had caused her death. Consequently, there is sufficient evidence to bind them over on this charge.

## C. FELONY MURDER

The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b). *People v Nowack*, 462 Mich 392, 401; 614 NW2d 78 (2000) (citation omitted; first alteration in original). Second-degree vulnerable adult abuse is an enumerated felony for purposes of felony-murder. MCL 750.316(1)(b). As to the second element, the prosecution here sought to establish that defendants created a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result.

We already have found sufficient evidence to bind defendants over for second-degree vulnerable adult abuse. For reasons we already have stated, there is sufficient evidence for a jury to find, based on their statements, that defendants killed their mother by withholding sufficient

---

[9] *Zak* is not binding precedent because it was decided in June 1990. See MCR 7.215(J)(1). However, its holding has been reaffirmed many times after November 1990. See, e.g., *People v Hudson*, 241 Mich App 268, 285 n 8; 615 NW2d 784, 792 (2000).

food from her.  And of course, by withholding sufficient food, defendants would have had knowledge that death or great bodily harm was the probable result.

## V.  CONCLUSION

For the reasons stated, the district court erred in finding insufficient evidence to bind defendants over, and the circuit court erred in affirming the dismissal.  We reverse the order of the circuit court and vacate the district court's order of dismissal, thereby reinstating the charges.  We remand the case to the district court for proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Jonathan Tukel
/s/ Michael J. Riordan