*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMES ROBERT CRUMBLEY,

Defendant-Appellant.

FOR PUBLICATION
March 23, 2023
9:10 a.m.

No. 362210
Oakland Circuit Court
LC No. 2022-279989-FH

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JENNIFER LYNN CRUMBLEY,

Defendant-Appellant.

No. 362211
Oakland Circuit Court
LC No. 2022-279990-FH

Before: MURRAY, P.J., and RIORDAN and YATES, JJ.

MURRAY, P.J.

Defendants James and Jennifer Crumbley are the parents of EC, who shot and killed four fellow students and injured many others at Oxford High School on November 30, 2021. EC pled guilty to four charges of first-degree murder. In these proceedings, the state has charged defendants with four counts of involuntary manslaughter related to those same deaths. At the conclusion of the preliminary examination, the district court concluded that there was sufficient evidence presented against defendants on these charges, including sufficient evidence of causation, and bound them over for trial. In a written opinion, the circuit court subsequently agreed and denied defendants' motion to quash the charges. This Court denied defendants' applications for

-1-

leave to appeal that decision,[1] but the Supreme Court remanded the case back to us to consider "whether there was sufficient evidence of causation to bind the defendant[s] over for trial on the charges of involuntary manslaughter." *People v James Crumbley*, ___ Mich ___; 981 NW2d 468 (2022); *People v Jennifer Crumbley*, ___ Mich ___; 981 NW2d 470 (2022). We affirm.

## I. BACKGROUND

### A. PRELIMINARY EXAM EVIDENCE[2]

Defendants, a married couple, lived together in Oxford with EC, who was 15 years old at the time of the murders. Jennifer worked full-time in the marketing department of a real estate company, while James worked for DoorDash, a food delivery company.

Although it is unclear from the record exactly when evidence of his problems first arose, the record is clear that by early 2021 EC began verbalizing situations he was experiencing that reflected instability in his mental health. For example, in March of that year, EC sent a series of text messages to Jennifer explaining his desire for Jennifer to come home, sending messages in close temporal proximity describing his self-described paranoia that someone was in the house with him: "[T]here's someone in the house, I think," "someone walked into the bathroom and flushed the toilet and left the light on," "[a]nd I thought it was you, but when I came out there was no one home," "[t]here is no one in the house, though," and "[d]ude, my door just slammed." About 10 minutes later, when Jennifer had not responded, EC sent another two text messages, stating, "maybe it's just my paranoia," and asking, "but when are you going to be home[?]" Jennifer did not respond until the next morning. According to defendants' cell phone records, neither defendant called EC that night.

About one week later, EC sent additional text messages to Jennifer, this time reflecting his belief that a demon was in the house, that it was throwing objects inside the house, and that he had taken a picture of it: "[O]kay, the house is now haunted," "some weird shit just happens and now I'm scared," "I got some videos," "and a picture of the demon," "IT IS THROWING BOWLS," "I'm not joking[, i]t f***ed up the kitchen," and "I'm just going to be an outsider for a while[.]" When Jennifer did not respond quickly enough, EC wrote, "can you at least text back[?]" Jennifer did not text back at any time that day, and her cell phone contained photographs showing she was taking pictures of James and herself riding horses at the time the messages were sent.

Approximately two days later, Jennifer messaged James about how EC was doing, and James responded that "he woke up looking like he had WAY too much to drink last night complaining about a headache." Jennifer was not surprised by EC's state, telling James, "well, [EC] was really worked up and out of control, so I can see why." Jennifer sent another message: "All I know is he needs to eat, go to work and work hard and not complain and he can get his stuff

---

[1] *People v James Crumbley*, unpublished order of the Court of Appeals, entered September 14, 2022 (Docket No. 362210); *People v Jennifer Crumbley*, unpublished order of the Court of Appeals, entered September 14, 2022 (Docket No. 362211).

[2] In our recitation of the facts, we focus only on the evidence relating to the discrete issue on appeal.

back." James then relayed something EC apparently said that morning: "He said, 'let me ask you a question. Why am I in your guys' room,' [laughing out loud (LOL)]." Jennifer responded, "[Oh my god (OMG)]," and James said, "I totally thought you were giving him Xanax last night." Jennifer stated she gave EC melatonin, a natural sleep aid.

EC continued to experience hallucination-type events, for just two days later, on March 20, EC sent Jennifer several text messages in quick succession: "I cleaned until the clothes started flying off the shelf," "this stuff only happens when I'm home alone," and "I picked the clothes back up, though." Once again, Jennifer was at the barn when those messages were sent and she did not respond.

The most prolific text message conversations were between EC and his best friend.[3] Just after midnight on April 5, 2021, EC sent text messages to his friend telling him he was "going to ask my parents to go to the doctor's tomorrow or Tuesday again," "but this time I'm going to tell them about the voices," and "I only told them about the people I saw." Amongst other things, EC told his friend that he had researched his symptoms and believed he was having a mental breakdown.

True to his word, EC informed his friend that he had asked his parents for medical help but that James refused the request, instead giving him some pills and telling him to "suck it up." Jennifer, according to EC, laughed at the request because she did not believe he had any mental health issues, but was instead using drugs. This made EC "feel like shit," such that he considered calling 911 so someone would take him to the hospital where he could get help. EC decided not to do so, he said, because defendants would be angry with him.

Communications between EC and his friend were about more than just mental health issues and problems with defendants. While many of the messages contained normal teenage banter, others involved conversations about wanting guns and making plans to buy them. For instance, three months before the shooting, EC sent his friend an 11-second video showing him loading a magazine into a .22-caliber Kel-Tec handgun registered to James. EC's friend responded, "niiice," and then wrote, "now, pull the trigger, [just kidding (JK)] JK JK JK." EC responded that: "My dad left it out, so I thought, 'why not?' LOL," and "[I know (IK)] . . . [g]un safety, so it's no problem." EC then said, "now it's time to shoot up the school," and "JKJKJKJKJK."

By October 2021, seven months after the first message in evidence on the topic, EC and his friend were still discussing EC's belief that he was having a mental breakdown. Defendants' text conversations during the same time period showed no indication that they considered finding some help for EC. Near the end of October, EC's conversations with his friend via text message stopped. Then the Crumbley family dog and one of EC's grandparents, died. Jennifer told Kira Pennock[4] she believed EC was having a hard time because he lost his only friend, his dog, and a

---

[3] There was no evidence that either defendant saw the text messages between EC and his friend, though the evidence did show that defendants had access to the information as EC's phone was registered to James.

[4] Pennock owned a barn where defendants housed their horses.

grandparent all in quick succession. According to Pennock, Jennifer did not speak about EC often, but when she did, she described him as "weird" and said he had no friends. Amanda Holland, one of Jennifer's co-workers, testified that Jennifer described EC as "quiet" and brought up concerns about him feeling lonely after his friend moved away. Jennifer did not speak to either of them about getting help for EC.

EC also kept a journal.[5] The journal referenced his friend, contained a drawing of a decapitated bird, depicted a demon, and discussed various other issues in EC's life. Every one of the 21 pages of written material had reference to plans to commit a school shooting. In one entry, for example, EC wrote, "I will cause the biggest school shooting in Michigan's history," and, "I will kill everyone I f**king see." EC also described a specific plan, explaining "the first victim has to be [a] pretty girl with a future so she can suffer like me." That same page contained a drawing of a girl being shot in the back of her head. EC partially blamed defendants in the journal, writing: "I have fully mentally lost it after years of fighting with my dark side. My parents won't listen to me about help or a therapist," and, "I have zero help for my mental problems and it's causing me to shoot up the f**king school."

On November 26, James and EC went to a gun shop because James wanted to purchase a nine-millimeter SIG Sauer handgun. To make this purchase, James provided his identification, filled out and signed the required form, and waited for completion of the background check. The form James signed indicated that purchasing a gun for someone else was illegal. When the background check cleared, James purchased the SIG Sauer, which was given to him in a case containing a cable lock, a trigger lock, an ATF Youth Handgun Notice Act pamphlet, and extra magazines of ammunition.[6]

Later that same day, EC posted two photographs and a video on his Instagram account. Both photographs were of the SIG Sauer, and the video showed EC holding the gun. In the background of the video, the gun case, ATF pamphlet, and unopened gun lock are visible. The caption on EC's Instagram post stated: "Just got my new beauty today, [heart-eyes emoji]. SIG Sauer 9-millimeter. Ask any questions, I will answer."

The next day Jennifer took EC to a shooting range. Upon arrival, Jennifer purchased 30 minutes of range time, paper targets, and two boxes of nine-millimeter ammunition. A surveillance video from the range showed Jennifer and EC firing the gun. EC went first, and then he showed Jennifer how to load the gun and helped her shoot it. Afterward, EC took the gun apart, put it back inside the case, grabbed the used paper targets, took the leftover ammunition, and left with Jennifer.

Later that day, EC posted on his Instagram account a photograph of the target with bullet holes through it and with a caption stating: "Took my new SIG out to the range today. Definitely need to get used to the new sites [sic], LOL." Jennifer posted photographs of the paper target and

---

[5] Evidence showed that defendants were aware of the journal, but no evidence was submitted that either read its contents.

[6] Amongst other things, the ATF pamphlet warned that "the misuse of handguns is a leading contributor to juvenile violence and fatalities."

the gun in its case on her own Instagram account, captioning her post with: "Mom and son day, testing out his new X-mas present. My first time shooting a 9-millimeter. I hit the bullseye." Although there was no way to verify whether defendants saw EC's Instagram posts, their cell phone records showed they did follow his Instagram account.

In the early morning hours of Monday, November 29, Jennifer performed an internet search on treatment options for clinical depression. Later that morning, EC was back at school. While in class, a teacher saw him looking at handgun ammunition on his cell phone. The teacher informed Mr. Ejack, Dean of Students, who forwarded the message to EC's school counselor, Shawn Hopkins, and another school official. Hopkins and the official met with EC that day and asked him about his cell phone activity. EC explained he was looking at ammunition because shooting guns was a hobby, and he had just gone to the shooting range with Jennifer and wanted to look up different bullets. Although EC was "[c]ompliant, calm, [and] understanding" during the meeting, and acknowledged researching ammunition was not a proper classroom activity, a school official attempted to contact Jennifer about the incident, leaving a voicemail explaining that "guns may be a hobby and there's nothing wrong with that," but that it was improper classroom activity. The official did not request Jennifer call back, and she did not do so.

After receiving the voicemail message, Jennifer began a text message conversation with EC that same morning. Jennifer wrote: "Seriously? Looking up bullets in school??" EC responded almost immediately and sent a string of messages in quick succession: "What?" "Oh yeah. I already went to the office for that." "It was in first hour. All I did was look up a certain caliber at the end of class because I was curious." "It was on my phone. Completely harmless. The teachers just have no privacy." "They said I'm all good. I understand why I [sic] they talked to me and they said that they that is am good [sic]," and "[t]his is nothing I should get in trouble about." Jennifer wrote back, telling EC that he was not in trouble, that she just wanted to inform him the school left her a voicemail and then added, "did you at least show them a pic of your new gun?" EC followed up with another string of text messages to Jennifer: "No, I didn't show them the pic, my God." "I only told them I went to the range with you on Saturday. It was a harmless act," and "I have this bullet cartridge in my room that I didn't [know] what kind of bullet it was and it said it was a .22, so at the end of first hour I just looked up different types of .22 bullets, and I guess the teachers can't get their eyes off my screen, [shaking my head (SMH)]." Jennifer responded by writing: "LOL. I'm not mad. You have to learn not to get caught." EC texted, "IK LOL," with laughing emojis, asked to listen to the voicemail, and explained that he was not trying to hide his cell phone but did not know a teacher was looking. Jennifer told EC she saved the voicemail and then spoke briefly to a co-worker about the voicemail. According to the co-worker, Jennifer did not seem concerned about the message.

On the morning of November 30, Jennifer went to work, James went to the barn to check on a sick horse, and EC went to school. In EC's backpack was the SIG Sauer handgun and his journal.[7] While in English class, EC was caught watching a shooting video on his cell phone, which the teacher reported to Ejack. Ejack forwarded the message to Hopkins at 8:30 a.m. By

---

[7] The last entry in EC's journal was written the day before, where he noted that he had the gun and ammunition, specifically mentioning the nine-millimeter SIG Sauer, and proclaimed the school shooting would be the next day. EC also wrote "forgive me" in big, bold letters.

the time Hopkins saw the e-mail at 8:50 a.m., EC had switched to math class. At about the same time, another message was delivered to Ejack from EC's math teacher, who had photographed EC's handwriting and drawings on a math worksheet and attached it to the message:



After Ejack went to Hopkins's office to discuss the math worksheet, Hopkins went to EC's classroom, grabbed the worksheet (which EC had already attempted to modify) off the desk, and walked EC to the office. The modifications EC made to the original worksheet were significant. As for redactions, EC scribbled out the gun (which closely resembled the SIG Sauer), the person bleeding from bullet holes, and the phrases "Help me," "My life is useless," "the world is dead," and "Blood everywhere." Added to the worksheet were statements that "I love my life so much," "Harmless act," "Were all friends here," "OHS Rocks!" and "Video game this is." The modified worksheet provided a more complete picture of how EC tried to cover up what he initially wrote and drew:



When questioned by Hopkins, EC said the video was of someone playing a video game, not an actual event, and that he enjoyed video games and was considering designing them as a career. Hopkins then asked EC about the math worksheet, which EC said was a drawing about a video game. After Hopkins asked EC about the statement that "my life is useless," EC's demeanor changed. According to Hopkins, EC became sad and started discussing his various troubles in life, specifically mentioning his friend moving away, difficulty dealing with the restrictions put in place to address the COVID-19 pandemic, and his dog and grandparent dying. EC also mentioned that he argued with his parents the night before regarding his grades.

Noting a concern about EC's mental health, and particularly suicidal ideation, Hopkins performed a "risk assessment" related to EC. Hopkins then left a voicemail message for Jennifer and called James, who also did not answer. Jennifer eventually returned the call and was asked to come to school to discuss EC's situation. Hopkins forwarded Jennifer photographs of the math worksheet (before and after modification) while they were speaking. Jennifer informed Hopkins that she would contact James to see who would come to school. In the meantime, Hopkins waited with EC.

Soon after the phone call, Jennifer attempted to contact James via Facebook Messenger, stating at 9:33 a.m.: "Call NOW. Emergency." In the following message, Jennifer attached both

math sheet photographs. James responded at 9:44 a.m., "my God, WTF." Immediately afterward, James informed Jennifer that the veterinarian still had not visited Pennock's farm to see their ill horse. Jennifer stated she thought EC was distraught about the night before and asked James to call her because she was driving to the school. Jennifer and James spoke on their cell phones for about seven minutes before both arrived at the school.

When defendants walked into Hopkins's office, they did not greet, touch, or hug EC, which Hopkins called "bizarre." Hopkins informed defendants about the video EC had been watching during his first hour class (he had already sent Jennifer both versions of the math worksheet), told defendants he was concerned about EC's mental health, provided them with mental health resources, and recommended they immediately take EC to a doctor or therapist that day. Jennifer objected to that suggestion, opining that getting EC care on that day was impossible because she and James had to return to work.[8] James did not disagree with Jennifer's statement. Despite his surprise[9] at that decision, Hopkins insisted that EC get medical attention within 48 hours. Because there was no disciplinary issue *requiring* EC to leave school, the decision was made for EC to remain at school. Hopkins believed it was good that EC would not be alone, considering the concerns about suicidal ideation.

During the nearly 15-minute meeting, Jennifer did not speak to EC. James, on the other hand, expressed to EC that he had people with whom he could talk, including defendants, and encouraged EC to write in his journal. Hopkins testified that Jennifer abruptly asked if the meeting was done, and Hopkins checked with Ejack before everyone left. On their way out, neither defendant hugged or said goodbye to EC. Hopkins, though, told EC, "I just want you to know, I care about you," because he did not believe EC was getting parental support. Hopkins doubted whether defendants planned to get EC help, so he planned to meet with EC the next morning to see how he was doing. Neither Ejack, Hopkins, nor defendants asked to or looked inside EC's backpack, which contained his journal and the SIG Sauer.

Surveillance footage showed defendants leaving Oxford High School at 10:54 a.m. and driving out of the parking lot at 10:56 a.m. Two minutes later, Jennifer contacted Pennock to discuss a horse-riding lesson scheduled for that evening. Jennifer told Pennock about EC's issues at school (and forwarded photographs of both versions of EC's math worksheet) but said she still planned to come to the lesson, though with EC. Pennock testified she was alarmed by the violent drawings and was aware that the Crumbleys owned guns. Pennock recommended equine therapy for EC, to which Jennifer responded: "Yeah, well, he'll be coming out with me tonight. James is working. [EC] can't be left alone." Pennock asked if EC would want to ride a horse, to which Jennifer wrote, "[m]aybe brush a small horse so he's not intimidated, LOL."

---

[8] According to the chief operations officer of Jennifer's employer, the company was family-friendly, and Jennifer would have been permitted to either work from home, bring EC to work, or use paid time off (PTO) on November 30. Kathy Poliquin, Human Resources Director for Jennifer's employer, testified that at that time, Jennifer had 12 hours of PTO available.

[9] Hopkins testified that this was the first time his recommendation to take a student out of school to get help was rebuffed by a parent.

While Jennifer messaged Pennock, James logged onto DoorDash and accepted his first delivery job at 11:00 a.m., just four minutes after driving out of the school parking lot. Jennifer returned to work, where she spoke with co-workers about the school meeting. Jennifer reiterated her concerns about EC being lonely, given recent events in his life, and showed both of them EC's math worksheet. Jennifer said she felt like a failure as a parent, agreed with the assessment that the drawings were disturbing and that EC needed counseling, and reiterated that she felt like a failure as a parent. One co-worker, however, also sensed that Jennifer was being sarcastic regarding the situation.

At 12:21 p.m., Jennifer sent a text message to EC asking if he was okay, and he responded he was and had just finished lunch. Jennifer then wrote, "[y]ou know you can talk to us and we won't judge," to which EC responded at 12:42 p.m., "IK thank you. I'm sorry for that. I love you." Fewer than 10 minutes after sending that message, EC went into a bathroom with his backpack, came out with the SIG Sauer, and committed the murders while also injuring six other students and one teacher. By 12:58 p.m., the shooting was over. Oxford High School sent out alerts to parents about an active shooter within the school. Jennifer received the information while at work and started screaming.

Upon receiving the alert, James drove home and unsuccessfully searched for the SIG Sauer and ammunition. At 1:18 p.m., Jennifer responded to EC's last text message by writing, "I love you too," and asking, "[y]ou ok,? [sic]." Four minutes later Jennifer told EC: "Don't do it." James apparently informed Jennifer of the missing gun and ammunition because she sent the following text message to a co-worker at 1:23 p.m.: "The gun is gone and so are the bullets." Jennifer then called James and, while sounding frantic, said she was attempting to get to the school and expressed concern that EC was going to commit suicide and that EC "must be the shooter."

At 1:34 p.m., James called 911 and told the operator his son went to Oxford High School and James's gun and ammunition were missing from his home. James relayed information about the school meeting and expressed concern that EC took the gun and was the school shooter. Pennock testified that when she heard the news of the school shooting, she immediately thought EC committed it, given the drawing on his math worksheet and defendants' gun ownership. Poliquin came to a similar conclusion, adding that she was aware of Jennifer's Instagram post about purchasing a handgun for EC.

On the day of the shooting, police executed a search warrant for defendants' home. In defendants' bedroom, Detective Adam Stoyek found the gun case for the SIG Sauer open on the bed next to an empty box of nine-millimeter ammunition and a locked gun safe in a dresser drawer of defendants' bedroom. The safe had a three-digit combination lock, which was set as "000," and contained James's other two guns. All of the gun locks found in the house were still in their original packaging. Detective Stoyek did not find any broken locks or a lock with which someone had tampered. Sergeant Matthew Peschke also participated in executing the search warrant and searched EC's room. According to Sergeant Peschke, the paper targets from the gun range were tacked to the walls. Fired shell casings, an array of folding knives, a notebook containing detailed drawings of guns, and the feces of a small animal were on top of the nightstand.

## B. TRIAL COURT PROCEEDINGS

Felony complaints against defendants were issued soon after their arrests, both of which alleged that defendants' grossly negligent conduct caused the deaths of the four victims by:

storing his or her firearm and its ammunition so as to allow access to the firearm and ammunition by his or her minor child or the grossly negligent failure to perform the following legal duty, to wit: failure to exercise reasonable care to control his or her minor child so as to prevent him from intentionally harming others or from so conducting himself so as to create an unreasonable risk of bodily harm to others knowing that he or she has the ability to control his or her child and knowing of the necessity and opportunity to do so[.]

After the conclusion of the two-day preliminary examination, the district court provided its decision to bind over defendants as charged. Citing *People v Head*, 323 Mich App 526; 917 NW2d 752 (2018), the district court articulated its reasons for doing so:

Therefore, in this case, after hearing extensive evidence—extensive testimony as well as evidence and reviewing and viewing extensive exhibits, the Court finds that the deaths of the four victims could have been avoided if James and Jennifer Crumbley exercised ordinary care and diligence in the care of their son. Specifically, the Court finds that the prosecutor has shown by a probable cause standard that, one, the defendants' son, [EC], presented a danger to the community; number two, that that danger was apparent to an ordinary mind; number three, that the defendants James and Jennifer Crumbley neglected to diligently address and/or divert that danger; and, number four, that the danger resulted in the four deaths of the young children at Oxford High School.

There was extensive testimony that [EC] was certainly a troubled young man and that the defendants had knowledge of that situation, but they purchased a gun which he believed was his and that he was free to use. Therefore, the Court is binding the defendants over as charged.

Before the circuit court, defendants filed a combined motion to quash the bindover, contending that the district court abused its discretion by finding probable cause existed to believe defendants committed involuntary manslaughter. In particular, defendants argued that the bindover had to be quashed because, as a matter of law, the prosecution could not prove causation. Though acknowledging that the issue of proximate causation, as opposed to causation-in-fact, hinged on whether EC's independent criminal actions were reasonably foreseeable, defendants argued that the district court's reliance on *Head*, and its ultimate conclusion, were in error.

The circuit court issued an opinion and order denying the motion to quash, explaining why it could not accept defendants' causation argument:

The Court concludes that sufficient evidence has been presented to allow a reasonable juror to find factual causation and to allow a reasonable juror to conclude that the deaths of the victims were a direct and natural result of the Defendants' gross negligence. The Court further concludes that the criminal

-10-

misconduct of the Defendants' son was an intervening cause but that a reasonable juror could conclude that his actions were reasonably foreseeable. Therefore, the causal link between Defendants' actions and their liability for the deaths of the victims, as alleged by the People, is not severed by the actions of their son. A reasonable juror could conclude that the action of the Defendants' son was a related link in the causal chain.

Because the circuit court concluded that the district court did not abuse its discretion in binding over defendants as charged, it entered an order denying the motion to quash.

## II. ANALYSIS

### A. STANDARD OF REVIEW

"As with all issues we address on appeal, the first question we must answer—and often it is one of the more critical ones—is what standard to apply when reviewing the trial court's decision." *People v Caddell*, 332 Mich App 27, 40; 955 NW2d 488 (2020). See also *People v Rodriguez*, 327 Mich App 573, 576; 935 NW2d 51 (2019). Appellate courts utilize varying standards of review, and which are employed depends on the issue raised (legal or factual), and the context in which it arose (from a trial, motion ruling, etc.). De novo review involves no deference to the trial court decision, *People v Hawkins*, 340 Mich App 155, 173; __ NW2d __ (2022), and is usually limited to issues of law. On the other end of the spectrum is the abuse of discretion standard, which grants much deference to the trial court decision. *Caddell*, 332 Mich App at 40 (recognizing the deferential nature of the abuse of discretion standard). Here, where we address a circuit court's decision on a motion to quash the bindover decision made by the district court, there are multiple standards of review.

In the context of reviewing a district court's bindover decision, the order on appeal is the circuit court's decision denying the motion to quash, which we review de novo (i.e., with no deference) because the dispositive question is whether the district court abused its discretion in binding over defendants. *People v Norwood*, 303 Mich App 466, 468; 843 NW2d 775 (2013) (quotation marks and citation omitted); *People v Redden*, 290 Mich App 65, 83; 799 NW2d 184 (2010). Thus, although we give no deference to the circuit court's findings in its review of the district court decision, we give a great deal of deference to the *district court's* decision, that is, we review that decision for an abuse of discretion. *People v Zitka*, 325 Mich App 38, 43; 922 NW2d 696 (2018).

"At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *People v Anderson*, 501 Mich 175, 189; 912 NW2d 503 (2018) (quotation marks and citation omitted). "An abuse of discretion occurs when a decision falls outside the range of reasonable and principled outcomes, and a trial court necessarily abuses its discretion when it makes an error of law." *Zitka*, 325 Mich App at 43-44 (quotation marks, citations, and alterations omitted). "However, '[t]o the extent that a lower court's decision on a motion to quash the information is based on an interpretation of the law, appellate review of the interpretation is de novo.'" *People v Bass*, 317 Mich App 241, 279; 893 NW2d 140 (2016), quoting *People v Miller*, 288 Mich App 207, 209; 795 NW2d 156 (2010).

-11-

## B. PROBABLE CAUSE STANDARDS

In general terms, "[t]he purpose of a preliminary examination is to determine whether a crime was committed and whether there is probable cause to believe that the defendant committed it." *People v Rogers (On Remand)*, 338 Mich App 312, 330-331; 979 NW2d 747 (2021) (quotation marks and citation omitted). More specifically, "in order to bind a defendant over for trial in the circuit court, the district court must find probable cause that the defendant committed a felony based on there being evidence of each element of the crime charged or evidence from which the elements may be inferred." *People v Simon*, 339 Mich App 568, 580; 984 NW2d 800 (2021) (quotation marks and citation omitted). "Probable cause requires enough evidence to cause a person of ordinary caution and prudence 'to conscientiously entertain a reasonable belief' of the defendant's guilt." *People v Ridge*, 319 Mich App 393, 403; 901 NW2d 406 (2017), quoting *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003). "The district court abuses its discretion by binding over a defendant when the prosecution has failed to present sufficient evidence to support each element of the charged offense." *Simon*, 339 Mich App at 580.

With these standards in mind, we now turn to the narrow issue presented in this appeal: whether the district court abused its discretion in concluding that the prosecution presented sufficient evidence to establish probable cause to believe that defendants caused the deaths of the four murder victims.

## C. CAUSATION

Causation is, of course, "an element of involuntary manslaughter." *Head*, 323 Mich App at 532, citing *People v Tims*, 449 Mich 83, 94; 534 NW2d 675 (1995). However, "[t]he concept of 'proximate causation' is obscure." Dressler, *Understanding Criminal Law* (3d ed.), Section 14.03 [A], p. 187.[10] Nevertheless, "[i]n the criminal law context, the term 'cause' has acquired a unique, technical meaning. Specifically, the term and concept have two parts: factual causation and proximate causation." *People v Czuprynski*, 325 Mich App 449, 461; 926 NW2d 282 (2018) (quotation marks and citation omitted). "Factual causation exists if a finder of fact determines that

---

[10] Professor Dressler makes the point that despite such terms and phrases as "superseding intervening cause," "direct cause" and "remote cause," there is no mechanical way to determine whether a defendant's action or inaction caused the victim's harm:

> In the process of determining proximate causation, courts and lawyers frequently bandy about conclusory terms like 'superseding intervening cause,' 'direct cause,' and 'remote cause.' An observer might assume from this language that a formula exists to produce uniform and reliable results in proximate-causation analysis. Although some scholars believe that causation is a metaphysical concept, it appears realistic to say that courts and juries don't *discover* the proximate cause of harm— they *select* it. The decision to attach causal responsibility for social harm to one, rather than to another, event is made in a, hopefully, common sense manner, or by application of moral intuitions, a community sense of justice, and/or public policy considerations. [*Id.* (footnotes omitted).]

'but for' defendant's conduct the result would not have occurred." *People v Feezel*, 486 Mich 184, 194-195; 783 NW2d 67 (2010). "The existence of factual causation alone, however, will not support the imposition of criminal liability. Proximate causation must also be established." *People v Schaefer*, 473 Mich 418, 436; 703 NW2d 774 (2005) (citation omitted). Concerns arise regarding "whether the defendant's conduct was the proximate or legal cause of the decedent's death," when "the death is so remote from the defendant's conduct that it would be unjust to permit conviction." *Tims*, 449 Mich at 95. In other words, proximate causation "is a legal construct designed to prevent criminal liability from attaching when the result of the defendant's conduct is viewed as too remote or unnatural." *Schaefer*, 473 Mich at 436. Importantly, under the criminal law, there can be more than one cause of harm, and a defendant's acts need only be a contributory cause that was a substantial factor in producing the harm:

> In assessing criminal liability for some harm, it is not necessary that the party convicted of a crime be the sole cause of that harm, only that he be a contributory cause that was a substantial factor in producing the harm. The criminal law does not require that there be but one proximate cause of harm found. Quite the contrary, all acts that proximately cause the harm are recognized by the law. [*People v Bailey*, 451 Mich 657, 676; 549 NW2d 32 (1996), amended 453 Mich 1204 (1996)].

"For a defendant's conduct to be regarded as a proximate cause, the victim's injury must be a 'direct and natural result' of the defendant's actions." *Schaefer*, 473 Mich at 436. Sometimes, as in this case, when there may be more than one potential cause of harm to the victim, "it is necessary to examine whether there was an intervening cause that superseded the defendant's conduct such that the causal link between the defendant's conduct and the victim's injury was broken." *Id*. at 436-437. "If the finder of fact determines that an intervening cause supersedes a defendant's conduct 'such that the causal link between the defendant's conduct and the victim's injury was broken,' proximate cause is lacking and criminal liability cannot be imposed." *Feezel*, 486 Mich at 195, quoting *Schaefer*, 473 Mich at 436-437. "Whether an intervening cause supersedes a defendant's conduct is a question of reasonable foreseeability." *Feezel*, 486 Mich at 195.

"Ordinary negligence is considered reasonably foreseeable, and it is thus not a superseding cause that would sever proximate causation." *Id*. On the other hand, "an act of God or the *gross* negligence or intentional misconduct by the victim or a third party will *generally* be considered a superseding cause . . . ." *Schaefer*, 473 Mich at 438-439 (emphasis added). Nevertheless, "[t]he linchpin in the superseding cause analysis [] is whether the intervening cause was foreseeable based on an objective standard of reasonableness." *Id*. at 437. "If it was reasonably foreseeable, then the defendant's conduct will be considered a proximate cause." *Id*. "If, however, the intervening act by the victim or a third party was not reasonably foreseeable—e.g., *gross* negligence or intentional misconduct—then *generally* the causal link is severed and the defendant's conduct is not regarded as a proximate cause of the victim's injury or death." *Id*. at 437-438 (emphasis added).

## 1. FACTUAL CAUSATION

We quickly dispatch with any argument that factual causation did not exist. "Factual causation is relatively easy to establish." *People v Rideout*, 272 Mich App 602, 604; 727 NW2d

630 (2006), rev'd in part on other grounds, 477 Mich 1062 (2007). The record squarely supports that "but for" defendants' acts and omissions, EC would not have killed the victims that day. *Feezel*, 486 Mich at 194-195. On the basis of the evidence presented at the preliminary exam, a reasonable fact-finder could conclude that EC would not have been able to shoot and kill four students but for defendants' decision to purchase their mentally disturbed son a handgun, their failure to properly secure the gun, and most importantly, their refusal to remove EC from school when he made overt threats to hurt other people. "But for" defendants' informed decision to leave EC at school, these murders would not have occurred that day.

## 2. PROXIMATE CAUSE

Subsequent to the trial court denying defendants' motion to quash, EC pleaded guilty to four counts of first-degree premeditated murder, MCL 750.316(1)(a). While there was no dispute during the trial court proceedings that EC's actions were intentional, his guilty pleas to first-degree premeditated murder cement that fact.[11] But was EC's intentional misconduct an intervening cause that superseded defendants' actions "'such that the causal link between the defendant's conduct and the victim's injury was broken,' [and] proximate cause is lacking and criminal liability cannot be imposed[?]" *Feezel*, 486 Mich at 195, quoting *Schaefer*, 473 Mich at 436-437.

Defendants contend that the answer is "yes," as they see firm statements in both *Schaefer* and *Feezel* to the effect that the intervening gross negligence or intentional misconduct of a third party must *always* be a superseding cause. But as with many things in life, this rule is not as black and white as defendants suggest. Indeed, while the *Schaefer* Court may have used expansive language when discussing a specific example, it also made clear that "[t]he linchpin in the superseding cause analysis . . . is whether the intervening cause was foreseeable based on an objective standard of reasonableness." *Schaefer*, 473 Mich at 437. Even when articulating the general rule that intentional misconduct "on the part of a victim is considered sufficient to break the causal chain between the defendant and the victim," the Court notes that this is so only "because [the intentional misconduct] is not reasonably foreseeable." *Feezel*, 486 Mich at 195 (quotation marks and citation omitted). Hence, EC's intentional misconduct did not, *as a matter of law*, supersede defendants' acts being a cause of the victims' deaths, see *id.* and *Bailey*, 451 Mich at 676, as his acts will only supersede defendants' acts if his intentional acts were not reasonably foreseeable (which, of course, is generally the case).

Turning now to the district court's proximate cause determination, the relevant facts revealed that, prior to arriving at the school on November 30, 2021: (1) defendants were aware that EC had been repeatedly experiencing significant episodes of hallucinations and/or extreme paranoia; (2) EC was in a distressed mental state because of the loss of his grandparent and the family dog, and the departure of his best friend; (3) EC himself realized his poor mental state such that he requested defendants to help him obtain medical assistance; (4) despite defendants' knowledge of EC's mental state, they purchased him a handgun which was readily accessible to EC; (5) on November 29, the day before the shootings, EC was researching bullets while in school; and (6) during first hour of class on November 30, EC watched a video involving a shooting, and

---

[11] For this reason, this Court's decision in *Head*, which involved the foreseeability of an accidental shooting, is not helpful. An accidental shooting, i.e., negligence, is normally foreseeable, whereas intentional acts like that involved here are not.

during second hour drew pictures of a bullet, a gun resembling the SIG Sauer, a person bleeding from bullet holes, and wrote "Blood everywhere," "The thoughts won't stop Help me," "My life is useless," and "The world is dead." Defendants were also presented with the significant modifications EC made to that worksheet, where he clearly intended to portray a different, happier message about the school and himself.

Despite their knowledge of all of these circumstances, when given the option to help EC and take him out of school, defendants did nothing. They did not, contrary to the recommendations of Hopkins, take EC home and get him immediate medical help. Nor, when they decided to leave him at school, did they tell school officials about EC's history of mental health issues nor explain to them that EC had access to a gun similar to the one he drew on the math worksheet. Defendants neither asked EC if he had the gun with him nor did they look in his backpack. And, when they left the school, defendants did not go home and ensure EC had not taken the gun.

Given all those facts, it was not an abuse of discretion to conclude that there was probable cause to believe that a juror could conclude that a reasonably foreseeable outcome of defendants' alleged gross negligence was EC committing a shooting that day. One of the few reasonably foreseeable outcomes of failing to secure the firearm that was gifted to EC was that it would be accessible to EC and that, in his mentally deteriorated condition, he might use it in unlawful ways. In light of those foreseeable events, when presented with what he had just drawn, written, and viewed that morning, a reasonable juror could conclude that it was foreseeable that EC possessed his recently gifted gun and intended to use it that day. As a result, a reasonable juror could conclude that EC's intervening acts were not a superseding cause of the murders.

In fact, given the uniqueness of the connection between EC and defendants, we question whether EC's acts are properly considered as intervening causes capable of superseding defendants' criminal responsibility. Indeed, in most cases involving a question of superseding cause, the third party or victim's act has no relation to the defendants. For example, in an early decision from the Supreme Court, *People v Rockwell*, 39 Mich 503 (1878), the defendant was convicted of manslaughter when he punched the decedent, who fell to the ground. After he fell, a horse either jumped on or kicked the decedent, killing him. During a second trial, the jury queried whether the defendant could be guilty if he knocked the decedent down, but the horse killed him. *Rockwell*, 39 Mich at 504. The trial court instructed that he could, and the jury convicted. The Supreme Court reversed, holding that there was no connection between the defendant and the horse such that it was foreseeable that the death would occur:

> It is impossible to maintain such a charge without making every one liable not only for natural and probable consequences, but for all possible consequences and circumstances which immediately follow a wrongful act. *There was no necessary connection between the act of respondent and the conduct of the horse, which he cannot be said from the record to have been responsible for.* [*Id.* (emphasis added).]

So too in more recent proximate-cause cases. In *Schaeffer*, the alleged intervening cause was an allegedly negligently designed highway off-ramp, *Schaeffer*, 473 Mich at 443-444, while in the companion case, *People v Large*, the alleged intervening cause was the victim riding a bike in front of the defendant's car. *Id.*, at 445. The purported intervening cause in *Feezel* was the victim's level of intoxication. *Feezel*, 486 Mich at 191. In each of these decisions, there was no

-15-

connection between the defendant and the intervening cause. They were separate and distinct from one another, which naturally led to the argument that the intervening cause was a superseding one.

But here, as we have explained, the evidence showed the opposite. Defendants' actions and inactions were inexorably intertwined with EC's actions, i.e., with the intervening cause. This connection exists not simply because of the parent-child relationship but also because of the facts showing that defendants were actively involved in EC's mental state remaining untreated, that they provided him with the weapon used to kill the victims, and that they refused to remove him from the situation that led directly to the shootings. In this circumstance, a reasonable juror could conclude that defendants' "conduct 'increase[d] the foreseeable risk of a particular harm occurring through . . . a second actor," *State v Pesquiera*, 235 Ariz 470, 477; 333 P3d 797 (App, 2014) (citations omitted), and that what EC did at Oxford High School that day was foreseeable.[12]

Finally, we share defendants' concern about the potential for this decision to be applied in the future to parents whose situation viz-a-viz their child's intentional conduct is not as closely tied together, and/or the warning signs and evidence were not as substantial as they are here. But those concerns are significantly diminished by several well-established principles. First, the principle that grossly negligent or intentional acts *are* generally superseding causes remains intact. We simply hold that with these unique facts, and in this procedural posture and applicable standard of review, this case falls outside the general rule regarding intentional acts because EC's acts were reasonably foreseeable, and that is the ultimate test that must be applied.[13] Second, our decision is based solely on the record evidence, and the actions and inactions taken by defendants despite the uniquely troubling facts of which they were fully aware. And this point is important, as although the judiciary typically recognizes that a decision's precedent is limited by the facts at issue, it is particularly true when the court expresses that limitation. See, e.g., *People v Carter*, 503 Mich 221, 229-230; 931 NW2d 566 (2019); *People v Dabish*, 181 Mich App 469, 478; 450 NW2d 44 (1989); *Duvall v Goldin*, 139 Mich App 342, 352; 362 NW2d 275 (1984), and *Crawfis v Gardner*, 65 Mich App 502, 504-506; 237 NW2d 509 (1975). Third, our decision is premised upon a deferential standard of review, and is based only upon the record established at the preliminary exam. Whether a jury actually finds that causation has been proven after a full trial, where the record will almost surely be more expansive (including evidence produced by defendants), is an issue separate from what we decide today.

---

[12] We acknowledge defendants' argument that no parent could reasonably foresee their child committing a mass shooting. But these issues are based on the facts and what is reasonably foreseeable under an objective standard, and the circumstances defendants were presented with on November 30, 2021, provided a heightened set of warnings that could lead a jury to find causation. Additionally, with respect to foreseeability, more relevant than the number of people shot is the foreseeability that EC would shoot someone that day.

[13] Much like in *Rideout*, where the Supreme Court held that a reasonable jury could find that the decedent's decision to leave an area of safety after defendant's conduct (which generally acts as a superseding cause) was foreseeable given the circumstances. *Rideout*, 477 Mich 1062.

The district court did not abuse its discretion in determining EC's decision to shoot four classmates was not a superseding cause because it "was foreseeable based on an objective standard of reasonableness." *Schaefer*, 473 Mich at 437.[14]  The circuit court's order is, therefore,

Affirmed.

/s/ Christopher M. Murray
/s/ Michael J. Riordan
/s/ Christopher P. Yates

---

[14] Defendants' reliance on *People v Zak*, 184 Mich App 1; 457 NW2d 59 (1990), is misplaced. Although *Zak* held that providing a weapon and opportunity for another to kill was an intervening cause of death that was not reasonably foreseeable, our facts are quite different.  Not only did defendants gift the gun to EC and allow him to stay in school, there was significant evidence that he was intending to use that gun to harm someone.